Argued and submitted November 9, 1998, affirmed on appeal; affirmed in part, reversed in part and remanded on cross-appeal May 19, petition for review denied September 28, 1999 (329 Or 357)

## Bruce ANGLIN,
*Respondent - Cross-Appellant,*

*v.*

## DEPARTMENT OF CORRECTIONS,
Eastern Oregon Correctional Institute,
and State of Oregon,
*Appellants - Cross-Respondents.*

(9511-08389; CA A97408)

982 P2d 547

Jas. Adams, Assistant Attorney General, argued the cause for appellants - cross-respondents. With him on the briefs were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Kevin N. Keaney argued the cause for respondent - cross-appellant. With him on the briefs was Willner Keaney Mata & U'ren LLP.

Before De Muniz, Presiding Judge, and Haselton and Armstrong, Judges.

DE MUNIZ, P. J.

## DE MUNIZ, P. J.

Plaintiff initiated this action for employment discrimination against his employer, Eastern Oregon Correctional Institute (EOCI)[1] under ORS 659.410,[2] ORS 659.420,[3] and ORS 659.425 (1995),[4] pertaining to discrimination on the basis of disability. The case was tried to a jury, which returned a verdict in plaintiff's favor, awarding total damages of $308,783. The trial court subsequently reduced the amount of the award to $200,000, inclusive of attorney fees, pursuant to the damages limitation of the Oregon Tort Claims Act (OTCA), ORS 30.270.[5] Defendants appeal, arguing that because, as a matter of law, the trial court erred in

[1] Defendants include EOCI, the Department of Corrections (DOC), of which EOCI is a part, and the State of Oregon.

[2] ORS 659.410(1) provides:

"It is an unlawful employment practice for an employer to discriminate against a worker with respect to hire or tenure or any term or condition of employment because the worker has applied for benefits or invoked or utilized the procedures provided for in ORS chapter 656 [relating to workers' compensation] or of ORS 659.400 to 659.460 or has given testimony under the provisions of such sections."

[3] ORS 659.420 provides, in part:

"(1) A worker who has sustained a compensable injury and is disabled from performing the duties of the worker's former regular employment shall, upon demand, be reemployed by the worker's employer at employment which is available and suitable.

"(2) A certificate of the worker's attending physician that the worker is able to perform described types of work shall be prima facie evidence of such ability."

[4] ORS 659.425 (1995) provided, in part:

"(1) For the purpose of ORS 659.400 to 659.460, it is an unlawful employment practice for any employer to refuse to hire, employ or promote, to bar or discharge from employment or to discriminate in compensation or in terms, conditions or privileges of employment because:

"(a) An individual has a physical or mental impairment which, with reasonable accommodation by the employer, does not prevent the performance of the work involved[.]"

[5] ORS 30.270 provides, in part:

"(1) Liability of any public body or its officers, employees or agents acting within the scope of their employment or duties on claims within the scope of ORS 30.260 to 30.300 shall not exceed:

"* * * * *

"(b) $100,000 to any claimant as general and special damages for all other claims arising out of a single accident or occurrence unless those damages exceed $100,000, in which case the claimant may recover additional special

denying its motion for a directed verdict, it was not required to accommodate plaintiff's disability. Plaintiff cross-appeals, arguing that the trial court erred in several respects in reducing the damage award pursuant to the OTCA. For the following reasons, we affirm on the appeal and affirm in part and reverse in part on the cross-appeal.

The dispute centers on whether EOCI should have reinstated plaintiff to a position within the Control Center of EOCI after he had sustained a compensable on-the-job injury that led to a permanent physical restriction on the use of his hand. Because of that physical restriction, plaintiff's physician advised against plaintiff having direct inmate contact. The Control Center serves as the hub of operations of the prison, monitoring activity throughout the prison. It is undisputed that under no circumstances are inmates allowed into the Control Center. It is also undisputed that at least one employee must remain in the Control Center at all times. Plaintiff's case centered around the theory that EOCI could have provided reasonable accommodation of his disability by assigning him to work in the Control Center.

Because the jury returned a verdict in plaintiff's favor, we view the evidence and the inferences that reasonably can be drawn from it in the light most favorable to plaintiff. *Greist v. Phillips*, 322 Or 281, 285, 906 P2d 789 (1995). In 1990, plaintiff went to work at EOCI as a corrections officer. EOCI is a medium security prison in Pendleton that houses about 1,500 inmates. On May 31, 1993, while he was on duty, plaintiff observed another corrections officer being attacked in the prison yard by an inmate wielding a weight-lifting bar. Plaintiff ran across the prison yard, struck the inmate with his right hand and restrained the inmate until more help arrived. Plaintiff's action saved the other corrections officer's life, and he was awarded a Medal of Valor by the Department of Corrections for his actions. However, in the course of his

---

damages, but in no event shall the total award of special damages exceed $100,000.

"* * * * *

"(2) No award for damages on any such claim shall include punitive damages. The limitation imposed by this section on individual claimants includes damages claimed for loss of services or loss of support arising out of the same tort."

action to restrain the inmate, plaintiff suffered a fracture to his right hand. Plaintiff returned to work on August 3, 1993, but continued to have serious difficulties with his hand. The fracture eventually healed, but plaintiff continued to suffer numbness and pain in the hand, as well as a loss of strength. Plaintiff made a workers' compensation claim concerning the injury that was accepted and ultimately led to an award of five percent permanent partial disability.

Because of his injury, plaintiff was placed in the EOCI mail room on a light-duty assignment. Molly Hansen, the personnel officer at EOCI, was responsible for assisting injured employees in returning to work. Plaintiff's physician had released plaintiff to return to work but had placed a restriction on plaintiff's contact with inmates due to the condition of his hand. Hansen tentatively identified three positions that might be suitable in light of plaintiff's restriction: Observation Post Officer; Perimeter Patrol; and Control Center Officer. Hansen provided a description of the duties of each of those positions (post orders) to a vocational analyst, Bill Gailey, and Gailey also spent time in the Control Center evaluating the position. The post orders do not indicate that a corrections officer in the Control Center ever has any direct inmate contact. From that information, Gailey developed a job analysis. Hansen forwarded Gailey's analysis to Dr. Tuscher, who contracted with the DOC to perform duty evaluations for employees. Hansen also sent a copy to plaintiff's treating physician, Dr. Thayer, indicating that plaintiff would be placed in one of those positions if the duties listed were within plaintiff's physical limitations. Both Tuscher and Thayer thought that plaintiff could perform the duties of a Control Center Officer within the given physical restrictions. Tuscher wrote:

> "*Control Center Officer* - Includes requiring Officer to work in a confined area, may alternate sitting and standing, utilize phones, radio, computer terminal control panel, fire alarm and perimeter fence indicator boards, twist the body trunk to accommodate self for observation and operating control devices. May use an ergonomic chair in the Control Center.
>
> "He is anticipated to be able to perform the essential tasks of this position because he would be able to utilize his dominant left hand and arm to perform the control and use of

equipment tasks, could change positions from sitting to standing and would not be required to exceed his lifting limitations. It also appears that in this position, he would be least likely to have direct inmate confrontation."

Thayer also was of the opinion that plaintiff could perform the Control Center Officer job and released him to that position. A vocational evaluator, Richard Ross, evaluated the reports of Tuscher and Thayer, as well as the reports of other physicians involved in plaintiff's treatment, and interviewed plaintiff. Ross likewise concluded that the Control Center position was suitable for plaintiff and that he could perform the work within his physical limitations.

In August 1994, Hansen wrote to George Baldwin, superintendent of EOCI, indicating that the physicians had agreed that the Control Center position was the most suitable for plaintiff and that Thomas Wells of DOC Risk Management and Al Chandler, Assistant Director of DOC, supported putting plaintiff into that position. Baldwin, however, decided that plaintiff should not be offered the Control Center job. He gave three reasons for his decision. First, he believed that plaintiff could not properly handle a firearm. Second, he was concerned that plaintiff would be unable to work outside the Control Center in cases of emergency. Third, he noted that plaintiff had complained about the pain of his injury. Baldwin did not obtain any medical opinion or other input as to plaintiff's ability to use a firearm or his ability to handle the pain of the injury.

At about the same time that Baldwin made the decision that plaintiff would not be offered the Control Center position, Baldwin and other DOC management staff attended a meeting, described by Wells as one at which it was decided that "basically permanently disabled correctional staff will not be placed in correctional officer assignments." Wells indicated that he understood the law to require that "you have to look at each individual, the type of disability and make some analysis," but that, although there was great variety in the duties of various corrections officer positions, DOC had decided not to place disabled corrections officers into any corrections officer positions because those individuals could not perform the full range of duties required

throughout the entire job classification. Wells indicated that, although he knew that the law required DOC to consider each disability on a case-by-case basis, he believed that that entailed reviewing medical evidence to determine if a disability was permanent and that, if the medical evidence was that an individual had a permanent disability, that person would not be allowed to fill a corrections officer position.

Plaintiff testified that he was dismissed after Baldwin's decision not to offer him the Control Center position. He further testified that he is able to use firearms despite his injury. He had been scheduled by Hansen to take a firearms test but the test was canceled when Baldwin decided to dismiss him. He also testified that he had worked in the Control Center for approximately a year before his injury and that, during that time, he was never called from the Control Center to perform any tasks that required inmate contact. He testified that he was eventually rehired by EOCI in a clerical position that pays about $1,000 per month less than the corrections officer position. Plaintiff testified that the clerical job causes more strain on his disabled hand than would the duties performed by a Control Center officer. He testified that, in his current job that is located beside the Control Center, he has never seen a corrections officer called out of the Control Center to deal with an emergency. Plaintiff also presented evidence that the Control Center positions at EOCI were exempt from bidding through the collective bargaining unit and that management had complete control over who was assigned to Control Center positions.

Plaintiff presented medical evidence that he was capable of performing the tasks listed for a Control Center officer on EOCI's post orders. Plaintiff also presented expert testimony from vocational evaluator Ross, who testified that he had evaluated the Control Center position at EOCI and found that it was a suitable and appropriate position for plaintiff. Ross further testified that he had conducted a job analysis of the Control Center at the Marion County Jail and that a disabled individual was placed in the Control Center in that facility as a result. That individual had impaired ambulation due to knee surgery and was restricted from dealing with inmates.

Defendants presented evidence that, although one officer remained on duty at all times in the Control Center at EOCI, a second or third officer on duty there might on occasion be called out to perform other correctional officer tasks that could involve inmate contact. Defendants also presented evidence that generally the more experienced officer remained in the Control Center if others were called out. The Superintendent of the Columbia River Correctional Institution testified that placing disabled people into Control Center jobs presented a problem because the position is no longer available for other officers to rotate into.

Defendants presented testimony from Donald Webb, an administrator of the Board on Public Safety Standards and Training (BPSST), which certifies corrections officers. Webb testified that, although administrative rules permitted the agency to waive physical requirements for certification,[6] the agency would not waive the physical requirements pertaining to defensive tactics, regardless of what position the officer would fill, because, in Webb's opinion, a disabled individual could not fulfill the essential functions of any corrections officer position. Webb further testified that BPSST would take some sort of unspecified legal action to prevent Control Center positions from being reclassified so that non-certified disabled personnel could fill them.[7]

Defendants also presented evidence from Ted Nelson, the Commander of the Marion County Corrections Facility in Salem. Nelson testified that vocational evaluator Ross had never, to his knowledge, performed a job task analysis leading to the placement of a disabled worker in the Control Center at that facility. He did acknowledge that a person

---

[6] OAR 259-008-0010(7)(f) provides:

"The Board may waive any physical requirement where, in its judgment, the waiver would not be detrimental to the performance of an officer's duties, including the protection of the public and the safety of co-workers. The applicant may be required to demonstrate the ability to perform the essential functions of the job."

[7] BPSST is not a defendant in this case. Plaintiff was certified by BPSST and remained certified at the time that he was dismissed, and his certification would not have lapsed had he been reinstated to the Control Center job. Webb's testimony presumably was presented to demonstrate the hardship that EOCI would have in accommodating individuals with disabilities similar to plaintiff's disability. We express no opinion as to the lawfulness of BPSST's policy as stated by this witness.

with a knee disability had been placed in the Control Center for approximately five months but had sustained a further injury and had been taken off the job. He testified that he had since concluded that the Control Center was not suitable for someone with physical disabilities.

Defendants presented testimony from Bradley Heath, Security Manager for EOCI, who testified that he did not believe plaintiff was sufficiently experienced to be placed in the Control Center. Heath further testified that he had contacted his secretary who had told him that plaintiff had never been assigned to work in the Control Center.[8] He testified that plaintiff might have, at most, filled in for a few hours or possibly worked one day in the Control Center.

Defendants presented further testimony from numerous DOC personnel and supervisors, who indicated their unwillingness to work with disabled corrections officers because of their concerns that disabled individuals might not be able to deal with emergency situations requiring physical action.

Plaintiff then presented rebuttal evidence from Ross, the vocational counselor, who testified that he had, in fact, performed an evaluation at the Marion County facility as he had earlier testified and that he had met with Commander Nelson at the time. Plaintiff also testified on rebuttal, reasserting that he had indeed worked in the Control Center as he had earlier testified.

As noted, the jury found in favor of plaintiff on all of his claims, and this appeal ensued. On appeal, defendants argue that the trial court erred in failing to direct a verdict in their favor on the ground that plaintiff had failed to demonstrate that he could perform the essential functions of a corrections officer and that defendant could not be expected to accommodate plaintiff's disability.

The questions presented on appeal, when reduced to their essentials, are as follows: Did the trial court properly

---

[8] No issue concerning the admissibility of this testimony is before this court on appeal.

submit to the jury the issue of whether EOCI failed to reemploy plaintiff in "available and suitable" employment, ORS 659.420? Did the trial court properly submit to the jury the issue of whether EOCI discriminated in privileges of employment on the basis of plaintiff's physical impairment that, with reasonable accommodation by the employer, would not have prevented performance of the work involved, ORS 659.425 (1995)?[9]

Defendants argue that the evidence was undisputed that the Control Center position was a corrections officer position, that plaintiff could not perform all of the duties involved in all corrections officer positions and, therefore, that it was entitled to a directed verdict because no suitable employment for plaintiff was available and because he could not have performed the work involved with reasonable accommodation. Plaintiff, on the other hand, contends that he was not required to prove that he could perform every duty performed by every corrections officer throughout the state, regardless of what *position* that corrections officer filled; plaintiff contends that he demonstrated that the Control Center position was available and suitable and that he could perform the essential functions required for that position.

The question, then, is whether the "employment" or "work" referred to in ORS 659.420 and ORS 659.425 (1995) encompasses, as defendants maintain, an entire profession or job classification such as "corrections officer," or whether "employment" and "work" refer to a specific position or job, such as "Control Center officer." The terms "employment" and "work" are not defined in ORS chapter 659. However, the answer to this question is apparent from the context in which these words are used. ORS 659.405 provides:

"(1)   It is declared to be the public policy of Oregon to guarantee disabled persons the fullest possible participation in the social and economic life of the state, to engage in remunerative employment * * * without discrimination.

---

[9] The parties make no arguments on appeal relating specifically to ORS 659.410 (relating to discrimination on the basis of workers' compensation and discrimination actions).

"(2) The right to otherwise lawful employment without discrimination because of disability where the reasonable demands of the *position* do not require such a distinction * * * are hereby recognized and declared to be the rights of all the people of this state. It is hereby declared to be the policy of the State of Oregon to protect these rights and ORS 659.400 to 659.460 shall be construed to effectuate such policy." (Emphasis added.)

We believe that the legislative intent is clear. The legislature did not intend for an employer to be able to unilaterally declare an entire profession or job classification off limits to disabled people on the ground that their disabilities prevent them from performing some of the duties of some of the positions within that profession or job classification. Its use of the word "position" in the policy statement quoted above indicates that the legislature intended the focus to be on whether a disabled individual could meet the reasonable demands of a specific position, not every demand of every position within a profession or job classification. A holding that an employer could avoid compliance with laws prohibiting discrimination on the basis of disability in that manner would eviscerate the law, undermining its stated purpose of allowing disabled individuals "the fullest[.] possible participation in the * * * economic life of the state[.]" ORS 659.405(1). We agree with plaintiff that the proper focus of this case is on whether the Control Center position was suitable and available and whether plaintiff could have, with or without reasonable accommodation, performed the work involved in the Control Center position.

■　　Having settled that question, very little remains of defendants' arguments that they were entitled to a directed verdict. Defendants' arguments appear to rest on assertions that it is a hardship to employ people with disabilities in the Control Center because of BPSST certification issues, because Control Center staff are sometimes called to perform functions outside of the Control Center, and because defendants prefer to rotate employees out of the Control Center and into other positions on occasion. However, there also was evidence that plaintiff's BPSST certification would never have lapsed had he been reinstated to the Control Center position when he sought reinstatement or, alternatively, that

defendants could have reclassified the position to avoid BPSST's apparently inflexible stance that it would never make use of its administrative rule allowing waiver of physical requirements. There was evidence that, although Control Center personnel are occasionally called to perform duties outside the Control Center, one person always remains in the Control Center. Finally, there was evidence that Control Center positions were exempt from rotation within the collective bargaining system and that an employee could be given an assignment in the Control Center on a permanent basis at the employer's prerogative.

All of that evidence bore on the questions of whether the Control Center position was "suitable" for plaintiff and whether it would be an undue hardship for defendants to reasonably accommodate plaintiff's disability by permanently assigning him to the Control Center position. It bears noting that defendants' evidence called into question plaintiff's veracity and his ability to perform the job at all; as discussed above, defendants presented evidence that an unnamed secretary had claimed that plaintiff had never worked in the Control Center and that a member of its security staff did not think that plaintiff could adequately perform in the Control Center position. In short, there were disputed factual issues bearing on the issues of whether plaintiff was "suitable" for the Control Center position and whether the accommodation sought by plaintiff was "reasonable."

Defendants argue that this case is similar to *Blumhagen v. Clackamas County*, 91 Or App 510, 756 P2d 650, *rev den* 306 Or 527 (1988), and that they were therefore entitled to a directed verdict. In *Blumhagen*, a deputy sheriff sustained a permanent physical injury to her arm, and her physician indicated that she should not be reinstated to a patrol deputy position at the sheriff's office because of the nature of the injury and the nature of patrol work. *Id.* at 512. The plaintiff was placed in a light-duty desk officer position but was not given the job on a permanent basis. On the plaintiff's claim that she should have been placed into one of the desk officer positions, this court noted first that there was no evidence that one of those positions was available when the plaintiff sought reinstatement and, second, that the position was not suitable because "those positions rotate among

patrol deputies, [and] they require the basic deputy sheriff 103 classification and an ability to return to patrol work." *Id.* at 515. The plaintiff also argued that she could rotate into some of the other deputy sheriff positions that did not require patrol duty, but we rejected the idea that such an accommodation was "reasonable" because it "would have a serious impact on the department's entire rotation program," which was designed to allow "deputies who are suffering from 'burnout' to find relief and remain on the job in a temporary position at their normal salary." *Id.* at 517.

■        We agree that *Blumhagen* has a number of factual similarities to the present case and clearly is relevant to the issues at hand. However, we do not believe that *Blumhagen* leads to a conclusion that defendant was entitled to a directed verdict in this case. In *Blumhagen*, which was decided under an earlier version of the discrimination statutes, we reviewed *de novo* the trial court's ultimate determination that the defendant had not violated the discrimination statutes in failing to place the plaintiff in the position she sought. *Blumhagen* simply cannot be read to stand for the proposition that, if an employer asserts that it would prefer not to accommodate a disabled employee in a position because it would rather rotate other employees into that position, it is entitled to a directed verdict. Whether such an accommodation is reasonable is a question that must be decided on a case-by-case basis and generally presents a factual question for the jury.[10] In the present case, the factfinders *could* have reached a conclusion similar to that reached by the factfinder in *Blumhagen, i.e.,* that it would be a hardship for the employer to accommodate the plaintiff's disability under the circumstances. However, reasonable factfinders also could conclude otherwise on the evidence presented, particularly if they found plaintiff and his witnesses to be more credible

---

[10] In *Holmes v. Willamette University*, 157 Or App 703, 709 n 4, 971 P2d 914 (1998), *modified* 158 Or App 485, 975 P2d 922 (1999), we noted that questions of reasonable accommodation ordinarily were questions of fact for the jury. We left open the possibility that, when the underlying material historical facts are uncontroverted, the court might be able to determine some issues of reasonable accommodation as a matter of law. In this case, however, many of the crucial facts about plaintiff's abilities and the duties of the Control Center position were controverted and required resolution by a factfinder before a determination of reasonable accommodation could be made.

than defendants' witnesses. The trial court correctly determined that defendants were not entitled to a directed verdict.

■     We turn to plaintiff's cross-appeal. As noted, the jury returned a verdict in plaintiff's favor for a total of $308,783 in damages, and the trial court reduced the award to $200,000, pursuant to ORS 30.270. That reduced award included $25,000 in attorney fees. Thus, plaintiff's actual award was reduced to $175,000. On cross-appeal, plaintiff makes three arguments relating to damages. First, plaintiff argues that his award was not subject to the OTCA damages cap. Second, he argues that the trial court erred in reducing his attorney fee award from $44,300.82 to $25,000 and in including the $25,000 attorney fee award within the $200,000 OTCA damages cap. Finally, plaintiff argues that the trial court erred in denying his motion to amend his pleadings on the day of trial to add a claim for punitive damages. For the following reasons, we affirm in part and reverse in part on cross-appeal.

We first turn to the question whether damages awards under ORS 659.400 *et seq.* are subject to the OTCA damages limitation. Plaintiff argues that, because ORS 659.121(2), which authorizes actions such as his, contains no reference to the OTCA, such a claim is not subject to the OTCA limitation. He points to another discrimination statute, ORS 659.160, that *does* contain a specific reference to the OTCA and argues that an inference may be drawn that the legislature did not intend to include actions under ORS 659.121 within the OTCA limitation.

ORS 30.265(1) provides, in pertinent part: "Subject to the limitations of ORS 30.260 to 30.300, every public body is subject to action or suit for its *torts* and those of its officers, employees and agents acting within the scope of employment or duties[.]" (Emphasis added.)

> " 'Tort' means the breach of a legal duty that is imposed by law, other than a duty arising from contract or quasi-contract, the breach of which results in injury to a specific person or persons for which the law provides a civil right of action for damages or a protective remedy." ORS 30.250(8).

In *Brinkley v. Oregon Health Sciences University*, 94 Or App 531, 536, 766 P2d 1045 (1988), *rev den* 307 Or 571 (1989), we

held that an action brought under ORS 659.121 and relating to claims of discrimination on the basis of disability was subject to the OTCA notice requirements, because such an action was a "tort" action as defined in the above-quoted definition. Plaintiff fails to cite *Brinkley* or to explain how his action could be a "tort" action for purposes of the OTCA notice requirements but not for purposes of the OTCA damages limitation. We reject plaintiff's statutory argument without further discussion. Plaintiff also argues· in this assignment of error that the OTCA damages limitation violates Article I, section 10, of the Oregon Constitution. That argument was rejected in *Hale v. City of Portland,* 308 Or 508, 530, 783 P2d 506 (1989), and requires no further discussion.

■ Similarly, plaintiff's third cross-assignment of error concerning the availability of punitive damages in this type of case is controlled by our decision in *Faro v. Highway Division,* 143 Or App 388, 393, 923 P2d 1298 (1996), *aff'd in pertinent part by an equally divided court* 326 Or 317, 324, 951 P2d 716 (1998). We decline plaintiff's invitation to revisit that issue. The trial court did not err in denying plaintiff's motion to amend his pleadings.

■ In plaintiff's remaining cross-assignment of error, he contends that the trial court erred in including his award of attorney fees within the OTCA cap. The Oregon Supreme Court has addressed that question but did so under a previous version of the statute. In *Griffin v. Tri-Met,* 318 Or 500, 870 P2d 808 (1994), the court addressed whether the tort claim limitation found in ORS 30.270(1)(b) (1985)[11] included attorney fees, and concluded that it did. The court concluded that the term "liability" referred to more than simply damages:

> "Plaintiff concedes that the $100,000 limit on 'liability' in ORS 30.270(1)(b) (1985) is a limit on a public body's duty

---

[11] ORS 30.270(1)(b) (1985) provided:

"Liability of any public body or its officers, employes or agents acting within the scope of their employment or duties on claims within the scope of ORS 30.260 to 30.300 shall not exceed:

"\* \* \* \* \*

"(b) $100,000 to any claimant for all other claims arising out of a single accident or occurrence."

to pay money. Plaintiff argues, however, that the limit was meant to apply only to awards of tort damages, not to awards of attorney fees and costs. The statute, however, contains no such qualification. The statute provides that '[l]iability * * * shall not exceed * * * $100,000.' The statute does not refer to 'damages' at all. Had the legislature intended the limit on 'liability' to apply only to liability for tort damages, it could have said so.[7]

---

"[7] For example, the present version of ORS 30.270(1)(b) expressly provides that '[l]iability of any public body * * * on claims within the scope of [the OTCA] shall not exceed * * * $100,000 to any claimant *as to general and special damages.*' " *Griffin*, 318 Or at 508-09 (ellipses and emphasis in original).

Plaintiff argues that *Griffin* supports his contention that the current version of ORS 30.270(1), which specifically says that its limitations apply to "general and special damages," does not include attorney fees within the limitation. Defendants respond that, because the statute still refers to "liability," the word "liability" must be interpreted in the same way the court interpreted it in *Griffin*. Particularly in light of the *Griffin* footnote quoted above, which strongly suggests that a different analysis would apply under the current version of the statute, we find defendants' arguments unpersuasive. ORS 30.270(1)(b) currently provides that liability of a public body for claims within the scope of the OTCA shall not exceed "$100,000 to any claimant *as general and special damages* * * * unless those damages exceed $100,000, in which case the claimant may recover an additional *special damages*, but in no event shall the total award of *special damages* exceed $100,000." (Emphasis added.)

In order for defendants to prevail on their argument that attorney fees must be included within the liability limitation of that statute, they would need to demonstrate that either "general damages," or "special damages," or both, as those terms are used in that statute, include attorney fee awards. Defendants cite no authority for the proposition that the terms "general damages" or "special damages" as used in this statute—or in any other statute, or at common law, or in any dictionary definition, for that matter—include attorney

fee awards. Defendants, in fact, do not even try to argue that the terms "general damages" or "special damages" have ever been interpreted to include attorney fee awards. Rather, they argue that, because the legislative history of ORS 30.270(1)(b) contains no reference to attorney fees, the legislature must have meant "general and special damages" to encompass attorney fees.

Assuming, for the sake of argument, that we found it necessary to consult the legislative history of the statute, *but see PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-11, 859 P2d 1143 (1993) (courts should consult legislative history only when meaning is not clear from text and context), we would not find defendant's arguments to be persuasive, as the absence of legislative history on the subject of attorney fee awards tells us nothing. If, for example, the legislature enacted a statute that contained the word "apples," and we were called upon to look to legislative history to determine what apples the legislature meant, we would be unlikely to conclude that the term apples encompassed oranges on the ground that the legislative history made no mention of the fact that oranges are not apples. The OTCA damages limitation of ORS 30.270(1)(b) explicitly applies to "general and special damages." There is no basis to conclude from the text, the context, or even the legislative history, that the legislature intended the phrase "general and special damages" to mean "general and special damages and attorney fee awards." We agree with plaintiff that the trial court erred in including plaintiff's award of attorney fees within the OTCA liability limitation found in ORS 30.270(1)(b).

Affirmed on appeal; affirmed in part and reversed in part on cross-appeal and remanded for recalculation of plaintiff's damages and attorney fee award.