Argued and submitted March 14, 2019, reversed and remanded March 18, 2020

Timothy KELLEY,
an individual,
*Plaintiff-Appellant,*

*v.*

WASHINGTON COUNTY,
a domestic municipality, and
Washington County Community Corrections Center,
a subsidiary of a domestic municipality,
*Defendants-Respondents.*

Washington County Circuit Court
17CV12222; A166979

463 P3d 36

Plaintiff was a community corrections specialist for defendants. He brought this discrimination action, asserting that he was terminated because of his disability, obesity. Defendants responded that they discharged plaintiff for a nondiscriminatory reason, his inability to perform essential functions of the position, particularly running in response to emergencies. Plaintiff appeals a judgment dismissing his claim, arguing that the trial court erred in granting defendants' motion for directed verdict. He contends that the court erred in concluding (1) that running in response to emergencies was an essential function of the job and (2) that plaintiff failed to offer any evidence that he was able to perform that function. *Held*: Although the evidence compelled the conclusion, as a matter of law, that running is an essential function of the job, plaintiff presented some evidence to support the reasonable inference that he is capable of performing that function.

Reversed and remanded.

Andrew Erwin, Judge.

Micah D. Fargey argued the cause for appellant. Also on the brief were Rebecca Cambreleng and Cambreleng Law LLC.

Christopher A. Gilmore argued the cause for respondents.

Before DeHoog, Presiding Judge, and DeVore, Judge, and Aoyagi, Judge.*

DeVORE, J.

Reversed and remanded.

_____
* DeVore, J., *vice* Hadlock, J. pro tempore.

**DeVORE, J.**

Plaintiff was a community corrections specialist (specialist) for Washington County Community Corrections Center and Washington County. He brought this discrimination action, asserting that he was terminated because of his disability, obesity. Defendants responded that they discharged plaintiff for a nondiscriminatory reason. They asserted that he was unable to perform essential functions of the position, particularly running in response to emergencies. Plaintiff appeals a judgment dismissing his claim, arguing that the trial court erred in granting defendants' motion for directed verdict. He contends that the court erred in concluding (1) that running in response to emergencies was an essential function of the job and (2) that plaintiff failed to offer any evidence that he was able to perform that function.[1] We disagree with plaintiff as to the first assignment but agree with plaintiff as to the second assignment of error. We reverse and remand.

## STANDARD OF REVIEW

A decision to grant a motion for directed verdict is reviewed for legal error, and it is appropriate only when a defendant is entitled to judgment as a matter of law. *Miller v. Columbia County*, 282 Or App 348, 349, 385 P3d 1214 (2016), *rev den*, 361 Or 238 (2017). For a discrimination claim, such as this, the inquiry is whether a jury could have reasonably found that defendant discriminated against plaintiff. *Herbert v. Altimeter, Inc.*, 230 Or App 715, 717, 218 P3d 42 (2009). Our task is not to weigh the evidence or to assess witness credibility. *Coy v. Starling*, 53 Or App 76, 80, 630 P2d 1323, *rev den*, 291 Or 622 (1981). Rather, we view the evidence in the light most favorable to plaintiff, as the nonmoving party, affording him every reasonable inference that can be drawn from it. *Wheeler v. LaViolette*, 129 Or App 57, 60, 877 P2d 665 (1994). We must "deem plaintiff's testimony to be true." *Crawford v. Cobbs & Mitchell Co.*, 121 Or 628, 643, 257 P 16 (1927). A directed verdict should be entered "only

---

[1] In a third assignment of error, plaintiff contends that the trial court erred in concluding that he failed to show that defendants could reasonably accommodate his purported inability to run. Given our disposition we do not reach that issue.

in the exceptional case," where "reasonable persons could draw one inference and that inference being that defendant was not [liable]." *Hall v. State*, 43 Or App 325, 328, 602 P2d 1104 (1979), *aff'd*, 290 Or 19, 619 P2d 256 (1980) (brackets omitted). "[I]f more than one conclusion can be drawn from the facts, the case is for the jury." *Crawford*, 121 Or at 643. A defendant's motion for directed verdict "must be denied if there is *any* evidence from which the jury could find all of the facts necessary to establish the elements of the plaintiff's cause of action." *Miller*, 282 Or App at 349 (emphasis added).

## FACTS

Plaintiff worked as a specialist at a correctional center that is a "24-hour residential, minimum security treatment and work-release facility," housing up to 215 offenders who are finishing jail or prison sentences or receiving treatment. He served as a specialist for more than twenty years. Plaintiff is six feet three inches tall. He gained 300 pounds over his tenure, weighing approximately 600 pounds at the time of his termination from employment. Plaintiff experiences knee issues that cause significant pain and affect his mobility. He has difficulty accelerating up and down stairs and running.

According to its job description, the specialist's purpose is to "maintain security, coordinate the activities of residents and make certain they follow the facility regulations or procedures, and interact with residents by providing information and assistance." Although the majority of the "essential job duties" listed in the job description emphasize supervision, conflict resolution, communication, and administrative work, they also include following "protocol and procedures to handle emergency situations such as acting as the first responder." The "physical requirements" of the job entail, among other things, being "able to negotiate over short distances, which would include rapid acceleration up and down stairs, and running down the hall."

As a specialist, plaintiff's job was divided into several posts through which he rotated from shift to shift. About once per week, plaintiff was assigned to meal duty, which partially entailed driving a van a couple of blocks from one

facility to another to load, transport, and deliver meal carts and related items. For about 18 years, the center used a particular van that plaintiff was able to operate "perfectly." In July 2016, a new van replaced the older one. When plaintiff attempted to drive it for the first time, he discovered that it had insufficient legroom for him to operate the gas and brake pedals. Plaintiff notified his supervisor and the center's manager that he could not operate the van safely. The manager spoke with the human resources department, and plaintiff was placed on administrative leave.

In September 2016, plaintiff was asked to undergo a physical competency test (PCT) to determine whether he could perform the job's essential functions. An occupational therapist had designed the PCT after conducting a job task analysis, assessing the position's physical demands by observing and interacting with specialists at the center. The occupational therapist concluded that the position involved "[r]are running to emergent situations down hallways," for a maximum of 30 seconds at a time. He determined that, "if [running] happens, it would be a very rare occurrence." In light of that analysis, the PCT included a running requirement. The PCT was first implemented in 2015, and it was used exclusively to screen new applicants for employment.

Plaintiff cooperated with taking the PCT, although he was the only existing specialist required to undergo it. When plaintiff attempted to take the PCT, he was given the wrong one, a PCT tailored to the work of probation and parole officers. That PCT had more rigorous requirements than the one designed for specialists, including for running. During that testing, plaintiff was asked to run on a treadmill and, while doing so, his pants slipped down, and he fell. The test administrators asked whether plaintiff wanted to continue, but he declined because he had injured his forehead, elbows, and knees, and he felt humiliated.

Plaintiff received a notice of medical layoff in November 2016, telling him that he would be laid off due to health conditions that prevented him from performing the full range of essential duties of the specialist position.

That same month, at the suggestion of human resources, plaintiff applied for long term disability insurance

benefits. Although plaintiff never considered himself to be
disabled, and although he believed that he could still per-
form the job duties of a specialist, he responded to the dis-
ability benefits application about why he was no longer per-
mitted to work in the position. He indicated that he was
unable to work at his occupation because of obesity and knee
issues, and that his symptoms were severe knee pain and
"not being able to walk or run." A physician completed a
section of the application and recommended that plaintiff
stop working due to "pain in knees" making him "unable
to do his work." The physician described plaintiff as having
"[d]ifficulty walking distances or standing for prolonged
periods" and stated that plaintiff would be impaired by
those limitations "until [weight] loss and knee replacement."

　　Thereafter, plaintiff filed this action, asserting
that defendants discriminated against him on the basis of
his disability, obesity.[2] He alleged that defendants failed to
engage in an interactive process to identify and provide a
reasonable accommodation that would have enabled him to
perform the position's essential functions. He alleged that,
instead, defendants took an adverse employment action
against him by terminating his employment. Defendants
filed an answer alleging that they had legitimate and
nondiscriminatory bases for plaintiff's termination. They
asserted that plaintiff was unqualified for the position due
to his physical inability to perform it.

　　At trial, the parties disagreed whether plaintiff
was qualified for the specialist position such that he would
be entitled to reasonable accommodation under Oregon
law. Specifically, they disputed whether running was an
essential function of the job, and, if so, whether plaintiff
was capable of running as required. Plaintiff argued that
running was not an essential job function. He stressed that
the job description did not include running or navigating
stairs among its "essential job duties" or "minimum qual-
ifications." Plaintiff presented testimony that, in practice,
specialists rarely had to run, and when they did, it was only
for very brief intervals. He also argued that, even if running

---

[2] Plaintiff also asserted claims for retaliation under ORS 659A.199 and ORS
659A.203, which are not at issue in this appeal.

was an essential job function, it was one that he was capable of performing. As support, he offered evidence of positive performance reviews spanning several years, including reviews from 2015 and 2016, testimony from himself and other witnesses, and a physical capacity assessment from 2013 indicating that he had been adequately performing the responsibilities and meeting the expectations of the job. Plaintiff also introduced evidence challenging the validity of the running test that he failed.

At the conclusion of plaintiff's case, defendants moved for a directed verdict. They argued that running was an essential function of the job and that the physician statements on plaintiff's application for disability benefits, as well as the PCT results, constituted undisputed medical evidence demonstrating plaintiff's inability to perform that function. The trial court granted the motion and entered a directed verdict on the grounds that plaintiff failed to adduce sufficient evidence to create a jury question as to whether he was a qualified individual who could, with or without accommodation, perform the position's essential function of running. The court determined, "The only evidence here is that he cannot run. It is an essential element of the job. And there has been no evidence that there is an accommodation that can be had for that."

On appeal, plaintiff argues that the trial court's decision to grant defendants' motion for directed verdict was improper. In plaintiff's first assignment of error, he contends that the court erred in concluding that running in response to emergencies was an essential function of the job. In a second assignment of error, plaintiff asserts that the court erred in concluding that he failed to present any evidence that he could run short distances. As before, defendants respond that running in emergencies is an essential function of the job and that plaintiff failed to present any evidence from which a jury could reasonably find that he could perform that function.

LAW

To provide context for the parties' arguments, we begin by outlining the law with respect to disability discrimination claims. In Oregon, it is an unlawful employment

practice for an employer to discharge someone from employment or to discriminate against them in compensation, terms, conditions, or privileges of employment on the basis of disability. ORS 659A.112(1). We construe Oregon's anti-discrimination law "to the extent possible in a manner that is consistent with any similar provisions of the federal Americans with Disabilities Act of 1990, as amended by the federal ADA Amendments Act of 2008 and as otherwise amended." ORS 659A.139. For that reason, interpretations of those federal laws are useful in our determination of whether an employer has engaged in impermissible discrimination under ORS 659A.112.[3]

Under ORS 659A.112(1), disability discrimination includes the failure to "make reasonable accommodation to the known physical limitations of a qualified individual with a disability." ORS 659A.112(2)(e). Employers need only accommodate such physical limitations when the individuals are *qualified*. A qualified individual is one who, "with or without reasonable accommodation, can perform the essential functions of the position." ORS 659A.115. "Except in those obvious cases where underlying material facts are undisputed, the question whether a disability renders an employee not 'otherwise qualified' is a question of fact for the jury." *Evans v. Multnomah County Sheriff's Office*, 184 Or App 733, 744, 57 P3d 211 (2002), *rev den*, 335 Or 180 (2003).

The determination as to whether an individual is qualified—and is thereby entitled to reasonable accommodation—depends on whether that person can perform the essential functions of the job with or without reasonable accommodation. ORS 659A.115. Essential functions are "fundamental duties of a position an individual with a

---

[3] "The question of the extent to which ORS 659A.139 requires us to interpret 'similar terms' in Oregon law in the same way those terms have been interpreted by federal courts and agencies has not been decided in Oregon." *Stamper v. Salem-Keizer School District*, 195 Or App 291, 298, 97 P3d 680 (2004) (citing Article I, section 21, of the Oregon Constitution); *see also Evans v. Multnomah County Sheriff's Office*, 184 Or App 733, 739, 57 P3d 211 (2002), *rev den*, 335 Or 180 (2003) ("Assuming that ORS 659A.139 requires (or can require) Oregon courts to follow federal case law decided after the Oregon statute was enacted, *but see Seale et al v. McKennon*, 215 Or 562, 572-73, 336 P2d 340 (1959) (state law cannot incorporate future federal regulations), nothing in [federal law] is inconsistent with interpreting ORS 659A.112 as we have done here.").

disability holds or desires." OAR 839-006-0205(4); *see also* ORS 659A.805(1) (authorizing rules). "Whether a particular job function is essential is evaluated on a case-by-case basis." *Samson v. Federal Exp. Corp.*, 746 F3d 1196, 1200-01 (11th Cir 2014); *see also McMillan v. City of New York*, 711 F3d 120, 126 (2d Cir 2013) ("[A] court must conduct 'a fact-specific inquiry into both the employer's description of a job and how the job is actually performed in practice.'" (Internal citation omitted.)); *Keith v. County of Oakland*, 703 F3d 918, 926 (6th Cir 2013) ("Whether a job function is essential is a question of fact that is typically not suitable for resolution on a motion for summary judgment." (Internal citation omitted.)).

Reasons that a function may be "essential" to a job include, but are not limited to, any of the following:

"(A)   The position exists to perform that function;

"(B)   A limited number of employees is available to carry out the essential function; or

"(C)   The function is highly specialized so that the position incumbent was hired for the expertise or ability required to perform the function."

OAR 839-006-0205(4)(a).[4] A variety of evidence may show whether a particular function is essential. "[D]ue consideration shall be given to the employer's determination as to the essential functions of a position." ORS 659A.115. The employer's judgment is "a factor to be considered along with other relevant evidence." EEOC, *A Technical Assistance Manual on the Employment Provisions (Title I) of the Americans With Disabilities Act* § II-2.3(a) (Jan 1992) (EEOC Manual); *see also* 42 USC § 12116 (authorizing the EEOC to issue regulations implementing Title I of the ADA); *Bragdon v. Abbott*, 524 US 624, 647, 118 S Ct 2196, 141 L Ed 2d 540 (1998) (citing EEOC Manual and noting that the United States Supreme Court "draw[s] guidance from the views of the agencies authorized to administer other sections of the ADA"). The employer's judgment serves as "important evidence," but it is neither "the only evidence" nor "the prevailing evidence." *Id.*

---

[4] In briefing, both parties rely on the administrative rule.

"If an employer has prepared a written description before advertising or interviewing applicants for a job, the position description shall be considered evidence of the essential functions of the job." ORS 659A.115. A job task analysis may be helpful in properly identifying essential functions of the job, so long as the employer conducts it in a manner that "focuses on the results or outcome of a function, not solely on the way it customarily is performed." EEOC Manual § II-2.3(b) (boldface omitted). In addition, evidence about whether a function is essential may include

"(A)   The amount of time spent performing the function;

"(B)   The consequences of not performing the function;

"(C)   The terms of a collective bargaining agreement;

"(D)   The work experience of past incumbents in the job; and

"(E)   The current work experience of incumbents in similar jobs."

OAR 839-006-0205(4)(b).

## ESSENTIAL FUNCTION

Plaintiff argues that the trial court erred in concluding, as a matter of law, that running was an essential function that he would need to be able to perform in order to be considered "qualified." He contends that the issue was reasonably in dispute. Plaintiff notes that the job description listed neither running nor accelerating on stairs under the "essential duties" heading. He points to testimony that the job involved minimal running. Plaintiff argues that "numerous" specialists could respond quickly to emergencies at any given time and that a specialist need not respond if that specialist is working at the front desk. Given those facts, plaintiff contends, the question should have gone to the jury. In response, defendants emphasize that the job description lists emergency response as an essential duty and that running and rapid acceleration on stairs are among the physical requirements. They dispute plaintiff's characterization of the testimony, and they contend that it showed that, although running was rare, it was crucial.

We conclude that the trial court did not err in concluding, as a matter of law, that running in response to emergencies was an essential duty for specialists to perform. A number of considerations lead to that conclusion.

First, as Oregon Administrative Rules recognize, running to an emergency could be essential to plaintiff's position because of the limited number of employees available to perform it. OAR 839-006-0205(4)(a)(B) (reasons that a job function may be essential include "[a] limited number of employees is available to carry out the essential function"); *see also, e.g.*, EEOC Manual § II-2.3(a)(2) ("It may be an essential function for a file clerk to answer the telephone if there are only three employees in a very busy office and each employee has to perform many different tasks.").

The record shows that, at any given time, four to seven specialists are on duty to supervise up to 215 residents, some serving sentences for serious violent crimes. Those specialists occupy various posts located throughout the building that fulfill specific responsibilities: (1) front desk, which checks people in and completes "desk duties"; (2) lobby, which searches people entering the facility, administers drug and alcohol tests, and assists with meal duties; and (3) first floor and second floor, which patrol, count residents, distribute medications, and relieve other staff during breaks. When staffing permits, an additional specialist assumes the second-floor post, and, during the "swing shift," a specialist oversees meals and then "help[s] out as extra." Two to four specialists can respond to a given emergency. Plaintiff said that the center is "running so skeleton crew lately," that the number of specialists working is "at a bare minimum," and that, in an emergency, they "need all staff available." A coworker testified to a time that she intervened in a physical altercation between two men in the cafeteria with 110 residents present. No one responded when she called for back-up, and she "had to break up the fight physically [her]self." That coworker testified that she now assumes that she must be able to handle a situation on her own without back-up. That evidence indicates that running to emergencies would be an essential duty for specialists given the sparse staffing and the size and nature of the resident population.

Second, the employer's judgment is that running is an essential function of the job. According to the job description, emergency response is an essential duty, a duty that could involve running and accelerating on stairs, which are both listed as physical requirements.

Third, defendants developed a job task analysis, based on first-hand observations of and conversations with specialists, that concluded that the position involved running to emergency situations down hallways for up to 30-second intervals.

Fourth, the failure to run to an emergency and respond in a timely manner could have grave consequences. Plaintiff recalled multiple violent altercations, medical issues, and fires, all scenarios that could seriously endanger the physical health and safety of residents and staff. He explained that "you'd have to run to whatever situation is happening." A supervisor similarly testified that residents sometimes become violent or have medical emergencies and that specialists must run to intervene or provide aid. Although some evidence indicated that specialists spend only a minor amount of time performing the function, "a function that is performed infrequently may be essential because there will be serious consequences if it is not performed."[5] EEOC Manual § II-2.3(a) (explaining that "a firefighter may only occasionally have to carry a heavy person from a burning building, but being able to perform this function would be essential to the firefighter's job"). The record here is undisputed that running to emergencies is crucial when required.

Fifth, testimony of past and current specialists regarding their experience on the job confirmed that responding to emergencies was an essential function of the position. Plaintiff said that he had responded to various emergencies over the years, including violent altercations, medical issues, and fires. He explained that he would have

_____

[5] Specifically, the occupational therapist concluded that, in the job task analysis, running "would be a very rare occurrence." Plaintiff testified that emergencies occurred rarely. A coworker testified that, although an emergency might arise a couple of times in a single month, eight months could transpire without one. And another coworker said emergencies arise once or twice per year.

to run to situations, sometimes three times in a single day. A supervisor testified that residents sometimes become violent or have medical emergencies and that specialists must run to intervene or provide aid. A prior specialist said that he "absolutely" had run, and that he would jog to emergencies, which sometimes occur multiple times in a single month. Another said that specialists must run to emergencies, albeit infrequently and only for short intervals. Another testified that, although she would never run or sprint, she would "walk quickly," and she agreed that specialists need to be able to "get from A to B quickly" when situations arise.

In sum, the record permits no other conclusion than that running in response to emergencies is an essential function of the specialist position. Accordingly, we reject plaintiff's first assignment of error.[6]

## EVIDENCE OF ABILILITY

We turn to plaintiff's second assignment of error. He argues that, even if running was an essential job function, a jury could have reasonably found that he was capable of performing it and that he was therefore a qualified individual entitled to reasonable accommodation. Plaintiff contends that the trial court erred in concluding otherwise. As support, he cites his positive performance reviews, his testimony and that of other witnesses, and a physical capacity assessment from 2013. Plaintiff also challenges the validity of the 2016 running test that he failed.

---

[6] We do not hold, as defendants urge, that running in response to emergencies is an essential functional of *all* correctional officer positions as a matter of law. Such an approach runs counter to the case-by-case inquiry that the statutes require. Indeed, we have previously declined to adopt blanket rules in cases dealing with discrimination against corrections officers with disabilities, noting that

"[t]he legislature did not intend for an employer to be able to unilaterally declare an entire profession or job classification off limits to disabled people on the ground that their disabilities prevent them from performing some of the duties of some of the positions within that profession or job classification. *** A holding that an employer could avoid compliance with laws prohibiting discrimination on the basis of disability in that manner would eviscerate the law, undermining its stated purpose of allowing disabled individuals 'the fullest possible participation in the *** economic life of the state.'"

*Evans*, 184 Or App at 742-43 (quoting *Anglin v. Dept. of Corrections*, 160 Or App 463, 473, 982 P2d 547, *rev den*, 329 Or 357 (1999)).

Defendants respond with several different arguments. First, defendants disagree that plaintiff's evidence could support a reasonable finding that he could run in response to emergencies. Second, they argue that plaintiff needed an expert's evidence in light of their "uncontroverted medical evidence." Third, they argue, for the first time in the litigation, that plaintiff should be judicially estopped from claiming that he can run given his representations to the contrary in his application for disability benefits. We take those arguments in turn.

First, we agree with plaintiff that the record contains some evidence from which the jury could find that he was a qualified individual. There was some evidence that he could perform the job's essential functions—including running in response to emergencies. No one disputes that plaintiff satisfies the requisite skill, experience, education, and other job-related requirements of the position. On this record, a jury could also find that plaintiff was capable of performing short-distance running at the time of his termination in 2016.

That evidence includes performance reviews from 2015 and 2016, the latter occurring within a few weeks of plaintiff discovering that he could not safely operate the van. Therein, plaintiff's supervisor indicated that plaintiff "meets overall job requirements" and "effectively performs responsibilities of the position as presented" in the "documentation," including "job descriptions." As mentioned, the job description encompassed responding to emergencies, accelerating rapidly up and down stairs, and running down halls. By stating that plaintiff effectively performed the job description duties, plaintiff's supervisor acknowledged plaintiff's ability to respond to emergencies, rapidly accelerate on stairs, and run.

Plaintiff's supervisor, who gave those performance reviews, testified that plaintiff was "an excellent employee." The supervisor could not recall having ever given plaintiff any feedback regarding plaintiff's physical issues or abilities. He acknowledged that plaintiff's weight and knee issues would make running "a significant amount of distance" difficult and cause plaintiff to run slower, bringing

into question his response times during emergencies. However, the supervisor said that, if he had concerns regarding plaintiff's ability to respond in an appropriate manner, he would have mentioned those concerns in the performance evaluations, and he never did so. He said that, "up until the point he was not able to drive the meal van," plaintiff was "doing his job."

Plaintiff testified to his ability to run and respond quickly to emergency situations. He said that, in cases of emergency, he would "have to run to whatever situation is happening," typically 20 to 30 seconds at a time, sometimes three times in one day. Plaintiff testified that he absolutely responded to emergency situations, and that he would "hightail" it whenever he learned of or witnessed resident violence. Although he would not be the fastest to respond, he would respond, and he would not be the last to arrive. Plaintiff said that, according to his step-counter, he walked up to 8,000 steps daily. He noted that, until the van incident, no one mentioned his size, speed, movement, or ability to respond to an emergency, and no one otherwise expressed concern about his ability to do the job. Plaintiff said that he successfully "did [his] job every day up until the day that [he] was let go." Thus, plaintiff specifically addressed his ability to respond to emergencies and run short distances, testimony we deem "to be true" when reviewing the evidence in the light most favorable to him. *Crawford*, 121 Or App at 643.

Plaintiff's coworker provided consistent testimony. She said that she had seen plaintiff "get places fast" and "move pretty fast." The coworker had no concerns regarding plaintiff's ability to respond to an emergency in a timely manner. She testified that she had personally seen plaintiff respond and "ma[k]e it where he needed to be in a timely manner." The coworker said that she never observed plaintiff struggle with his job; he was able to perform all of the responsibilities.

In addition, plaintiff offered into evidence results from a physical capacity assessment that he took in 2013. In it, a physician indicated that plaintiff could "perform the essential duties and functions" described, which included the physical requirements from the job description. The

physician confirmed that plaintiff, "without restriction, limitation, or adverse impact to self or others" could accelerate up and down stairs, run down the hallway, and intervene in a dispute or altercation to protect himself or others. The physician concluded that plaintiff could continue the work without restrictions despite his knee issues. Although that three-year-old test is not direct evidence of plaintiff's condition at the date of his termination, it offers insight into his physical capabilities during the years leading up to that date. The fact that plaintiff was able to run in the relatively recent past could support the inference, in combination with other evidence, that he was currently able to perform. The jury could consider such evidence to provide some context for plaintiff's current condition.

Also, plaintiff introduced evidence challenging defendants' purportedly objective metrics for determining whether he could respond to emergencies or run. During opening arguments, defendants had asserted that the PCT plaintiff took in 2016 was "independent, objective" evidence showing plaintiff's inability to meet the physical demands of the job. To refute that assertion, plaintiff introduced evidence undermining the validity of the test for defendants' proffered purpose. Specifically, plaintiff elicited testimony revealing that he had taken the more rigorous PCT intended for probation and parole officers.[7] In addition, plaintiff had been the only existing specialist up to that point who was required to take that test. That evidence could draw into question the test's usefulness and fairness, and, in turn, defendants' claim that it showed that plaintiff was unable to perform his duties.

In short, plaintiff did present some evidence to support the finding that he could respond to emergencies by running short distances, such that a directed verdict would not be proper.

---

[7] Defendants emphasize that plaintiff failed the portion of the running test that was the same for both examinations, implying that he would have failed the specialist's running test. However, it is undisputed that the test for probation and parole officers had more rigorous standards in a variety of categories. Affording plaintiff every reasonable inference, we note that the jury could consider how that discrepancy would have affected plaintiff's overall stamina and performance.

As a second argument, defendants propose a standard whereby the lay evidence upon which plaintiff relies cannot refute "uncontroverted medical evidence." They argue that competing medical evidence is required. Assuming defendants' evidence—the physician's statements supporting plaintiff's disability benefits application and the PCT results—can be characterized as "medical" and "uncontroverted," defendants nevertheless fail to cite authority to support their proposed legal standard. Rather, defendants rely on *Blumenhagen v. Clackamas County*, 91 Or App 510, 756 P2d 650, *rev den*, 306 Or 527 (1988), a case we decided under the entirely different *de novo* standard of review. Using that case, defendants would have us weigh and prioritize the evidence, something that our standard of review for a directed verdict does not permit. *Coy*, 53 Or App at 80. To defeat a motion for directed verdict, a plaintiff need only provide *some* evidence from which the jury could reasonably find the facts necessary to establish the elements of the claim.[8]

Finally, defendants argue, for the first time on appeal, that plaintiff is judicially estopped from asserting that he can run due to his prior representations to the contrary in his application for disability benefits. In granting defendants' motion for directed verdict, the court found that plaintiff had simply presented no evidence that he could run. The trial court never considered the issue of judicial estoppel. As a consequence, defendants urge us to affirm on grounds different from those upon which the court relied—that is, on a "right for the wrong reason" basis.

"[T]he 'right for the wrong reason' principle permits a reviewing court—as a matter of discretion—to affirm the ruling of a lower court on an alternative basis when certain conditions are met." *Outdoor Media Dimensions Inc. v. State of Oregon*, 331 Or 634, 659, 20 P3d 180 (2001). We lack such

---

[8] In motions *in limine*, defendants argued below that "lay opinion testimony about whether [plaintiff is] medically qualified is inadmissible." The trial court deferred a pretrial ruling on those motions and ultimately never reached them. On appeal, defendants raise no arguments regarding the admissibility of lay witness testimony on the question of whether plaintiff could run. However, we note that the Oregon Evidence Code "adopts a liberal standard for the admissibility of lay opinions" and lay witnesses may testify to their personal perceptions. *State v. Lerch*, 296 Or 377, 383, 677 P2d 678 (1984) (discussing OEC 701). A lay witness could surely testify to their own observations.

authority, however, when that basis involves an affirmative defense that was never set forth below. *See Clemente v. State of Oregon*, 227 Or App 434, 439-40, 206 P3d 249 (2009) (concluding that we lacked authority to consider an affirmative defense on a "right for the wrong reason" basis where the defendant had failed to raise it in any of the "various mandatory issue-framing provisions in the rules of civil procedure," including the responsive pleading, motion to dismiss, or motion for summary judgment).

Judicial estoppel is an affirmative defense that defendants failed to raise below. *See Petock v. Asante*, 237 Or App 113, 125, 240 P3d 56, *adh'd to on recons*, 238 Or App 711, 243 P3d 822 (2010), *aff'd on other grounds*, 351 Or 408, 268 P3d 579 (2011) ("Judicial estoppel is an affirmative defense." (Citing *Hampton Tree Farms, Inc. v. Jewett*, 320 Or 599, 611, 892 P2d 683 (1995).)). Defendants' answer did not include the defense or allege the facts upon which defendants now rely, *i.e.*, that plaintiff citing his inability to run in a separate proceeding for disability benefits prevents him from asserting otherwise in this case. Later, when moving for summary judgment, and then for directed verdict, defendants specifically told the trial court that they were *not* asserting any sort of issue preclusion on the basis of plaintiff's disability benefits application.[9] In other words, defendant took the opposite position regarding judicial estoppel in earlier proceedings. For those reasons, we will not consider judicial estoppel on a "right for the wrong reason" basis.

## CONCLUSION

In the end, the question of whether plaintiff was a qualified individual, who would then be entitled to reasonable accommodation, was for the jury. The decision to grant the motion for a directed verdict was error.

Reversed and remanded.

---

[9] Rather, defendants argued that the disability benefits documentation was medical evidence that plaintiff failed to refute, and that lay witnesses were unqualified to opine as to plaintiff's medical fitness.