Argued and submitted January 6, reversed and remanded for new trial on damages only September 10, 2003

Linda L. McLEAN,
Trustee utd January 17, 1994,
*Respondent,*

*v.*

CHARLES ELLIS REALTY, INC.,
an Oregon corporation;
and Gary Jensen;
and Donald Lemke,
*Appellants.*

16-99-19075; A112916

76 P3d 661

George W. Kelly argued the cause and filed the briefs for appellant Donald Lemke.

Susan D. Marmaduke argued the cause for appellants Gary Jensen and Charles Ellis Realty, Inc. With her on the briefs were William F. Gary and Harrang Long Gary Rudnick P. C.

Thomas W. Brown argued the cause for respondent. With him on the briefs were Robert E. Sabido and Cosgrave Vergeer Kester LLP.

Before Landau, Presiding Judge, and Armstrong and Brewer, Judges.

ARMSTRONG, J.

## ARMSTRONG, J.

Defendants appeal from a judgment for plaintiff after a jury trial on plaintiff's claims for negligence, breach of fiduciary duty, and fraud. The jury found for plaintiff on all claims and awarded her damages of $303,945. Defendant Lemke assigns error to the trial court's failure to grant his motion for a directed verdict on all of the claims on the ground that they are time barred, to the admission of evidence, to the jury instructions on damages, and to the denial of his motion for a mistrial based on juror misconduct. Defendants Charles Ellis Realty (Ellis) and Gary Jensen join in those assignments and also assert that the trial court erred in denying their motion for a directed verdict on the professional negligence and breach of fiduciary duty claims on the ground that there was no evidence that Jensen had a professional or fiduciary relationship with plaintiff; in denying their motion for a directed verdict on two of the specifications of fraud and breach of fiduciary duty on the ground that there is no evidence to support them; and, finally, in denying their motion for judgment notwithstanding the verdict or a new trial on the ground that the damage award is not supported by evidence. We reverse and remand for a new trial on damages but otherwise affirm.

We consider first whether the trial court erred in denying defendants' motions for a directed verdict based on the statute of limitation. In reviewing the trial court's denial of the motions, we view the evidence in the light most favorable to plaintiff, the party opposing them. *See Shockey v. City of Portland,* 313 Or 414, 422, 837 P2d 505 (1992), *cert den,* 507 US 1017 (1993). We will not set aside a verdict unless we can say affirmatively that there is no evidence from which the jury could have found the facts necessary to support the verdict. *Brown v. J. C. Penney Co.,* 297 Or 695, 705, 688 P2d 811 (1984).

This case is about a bad deal—not a deal that went bad, but one that started out bad and got worse. At the relevant time, Jensen was a licensed real estate sales person

employed by Ellis. Defendant Donald Lemke was a self-employed real estate broker who also developed real property. Jensen and Lemke had known each other for several years, and Jensen had sold properties for Lemke.

Dennis McLean is an electrician by trade. McLean is in business for himself, investing in houses that are in need of repair and reselling them. Plaintiff Linda McLean is his wife and the trustee of a trust that loaned money to Lemke's mother, Patricia Lemke. When the McLeans were looking for a personal residence in the Springfield area, they contacted Ellis's office for assistance. They were referred to Jensen, who helped them look for a property. The McLeans found a small farm in Brownsville, without Jensen's assistance.

Jensen and the McLeans struck up a friendship, however, and maintained social contact. Over the years, Jensen listed several of McLeans' properties for sale but was unable to sell them. McLean bought a "fixer-upper" through Jensen. In the summer of 1995, the McLeans refinanced their farm and obtained a $92,000 line of credit that McLean intended to use to buy, repair, and sell houses. McLean told Jensen of his plans, and Jensen suggested that the McLeans instead consider loaning $100,000 to Lemke, who Jensen said was in need of cash to purchase a property on River Road in Lane County for development and resale. Jensen would be the listing agent for the sale of the lots in the development. Jensen showed the McLeans a 1995 appraisal valuing the River Road property at $318,000. He told them that Lemke would be able to purchase the property for $300,000 and would contribute land having a value of $200,000 toward the purchase of the property.

The McLeans had never loaned money for commercial purposes before and initially were not interested in loaning money to Lemke, whom they did not know. But over the next few months, Jensen persuaded them that a loan to Lemke would be a good and safe investment. He falsely portrayed Lemke as an experienced and successful developer who was financially sound and had a net worth of $1.6 million. He explained to the McLeans that Lemke needed to borrow money to purchase the River Road property because his cash was tied up in a development that was near completion.

He explained that several of Lemke's developed properties would soon be sold and that Lemke could use the proceeds to repay the McLeans within 30 to 90 days or sooner.

Dennis McLean took an active role in the transaction. He visited the River Road property and other Lemke projects. He went over Lemke's drawings and project plans and reviewed comparable sales information bearing on the value of the River Road property. McLean met with Lemke on two occasions, and Lemke assured McLean that his real estate holdings were unencumbered, that he owed no money, and that he was a "cash and carry guy." McLean did not, however, seek any documentation or verification of Lemke's financial worth.

The McLeans and Lemke did not negotiate the terms of the loan directly but used Jensen as their intermediary. Lemke initially offered to pay $10,000 for the use of plaintiff's money. The McLeans refused and also turned down offers of $20,000, $30,000, and $40,000 for the use of the money for the first year. Ultimately, in December 1995, the McLeans agreed to loan $100,000 to Lemke with a $50,000 return in lieu of interest.

Jensen admitted that he gave the McLeans advice concerning some aspects of the transaction. The McLeans testified that they believed that Jensen was acting on their behalf in negotiating the loan; Jensen testified that, although he had had a professional relationship with the McLeans in the past, in the context of this transaction he helped them only as a friend, not as a professional. In fact, he had told the McLeans that, after the River Road property was developed, he would be listing the lots for Lemke. The McLeans wondered whether they should consult an attorney. Jensen told them that it was not necessary because the closing documents had been prepared by an attorney and the escrow company would take care of the details of the transaction. Similarly, they asked Jensen whether they should obtain a credit report on Lemke, but he told them it was not necessary, that Lemke was financially solid. He also explained other aspects of the transaction.

Shortly before the transaction closed, plaintiff learned that title to the River Road property would be held by

Patricia Lemke, Lemke's elderly mother, and that Advanced Investment Corporation (AIC), a "hard-money lender," would be loaning Patricia Lemke $80,000 and would have a first lien on the property. The loan from plaintiff would be subordinate to the AIC loan and take a second position. The McLeans were not familiar with the effect of subordination. Jensen explained that they should not be concerned because the AIC loan would be spent on development and would directly enhance the value of their collateral. In fact, there were no limitations on the use of the AIC money, and it was not used to make improvements on the property. Additionally, Patricia Lemke would hold one of the River Road lots free and clear of plaintiff's mortgage; thus, plaintiff's loan would be secured by a second mortgage on only 5 of the 6 lots, or 88 percent of the property.

At closing, Patricia Lemke executed a promissory note in favor of plaintiff. The note provided that Patricia Lemke would pay plaintiff $150,000 by December 8, 1996, and that a one-year extension was available with interest at a rate of 20 percent. Verbally, Jensen told plaintiff that she could expect to be repaid in 30 to 90 days from the proceeds of sale of the River Road property or other properties. As defendants Jensen and Ellis note in their brief, the deal was too good to be true.

Jensen was aware at the time of closing but failed to disclose to plaintiff that Lemke had a $45,000 federal income tax debt. Plaintiff did not learn until February 1998 that Lemke received $36,000 cash at closing and used that money to pay other obligations that had nothing to do with the River Road property or its development. Additionally, the day after closing, Jensen received a $3,000 payment from Lemke as a finder's fee for having secured the loan from plaintiff despite earlier assurances by Jensen that he would not take a fee until plaintiff's loan had been paid off. Jensen received copies of the closing documents; plaintiff did not, however, and she was not aware that the consideration stated for the property was $135,000, not $300,000, as had been represented by Jensen. Further, there is no documentation of the land swap through which Lemke was to contribute $200,000 toward the purchase of the property.

The McLeans noticed that no improvements were being made on the property, and, after 90 days, they became concerned. In February 1996, Jensen told the McLeans that Lemke needed to borrow an additional $10,000 from AIC and to further subordinate plaintiff's loan. Jensen assured the McLeans that, although no improvements had been made, everything was going fine. At the end of 1996, work had yet to begin on the property.

In early 1997, Jensen had a conversation with McLean about the project and mentioned that, if the development did not work out, then Lemke would file for bankruptcy. Jensen also explained to the McLeans that Lemke had occasional bouts of drinking that interfered with his work. However, Jensen continued to reassure the McLeans that the project was on track.

In April 1997, Patricia Lemke defaulted on the loan to AIC. In October 1997, Jensen asked plaintiff to execute an agreement to release the lots for less money. Plaintiff agreed, eager to do what was necessary to help the project along. Finally, in November 1997, about 15 days before the note's December 8, 1997, due date, McLean visited Jensen at his house and expressed considerable anxiety that the project was not further along. Jensen reassured him that everything was fine. At that point, McLean mentioned that he and plaintiff were planning to hire an attorney. Jensen responded that his own attorney had advised him not to speak to the McLeans and asked McLean to leave.

Lemke filed for bankruptcy. In January 1998, plaintiff hired an attorney to begin foreclosure proceedings. At that time, plaintiff learned of the true purchase price of the property, of the federal tax lien, and that Lemke had received $36,000 from the closing on the property. In order to retain their interest in the property, the McLeans first borrowed money so that they could pay off AIC's loan, which had grown to $122,000, including interest. In April, 1999, Patricia Lemke stipulated to a foreclosure judgment that included $40,000 in attorney fees incurred by the McLeans.

Plaintiff sold the River Road property for $250,000. After payment of AIC, attorney fees, and fines on the property, she received a net recovery of $88,000. On October 11,

1999, plaintiff filed the complaint in the present proceeding, asserting claims against Jensen for fraud, professional negligence, and breach of fiduciary duty, against defendant Ellis for the same claims based on vicarious liability and for negligence in hiring Jensen, and against defendant Lemke for fraud. The case was tried to a jury. Over defendants' objections, in addition to evidence concerning plaintiff's out-of-pocket losses, the jury heard testimony from plaintiff's expert concerning plaintiff's "benefit-of-the-bargain" damages. After plaintiff rested, Ellis and Jensen moved for directed verdicts on all claims against them, on the separate negligence claim against Ellis, and on their affirmative defense that the claims were barred by the statute of limitation. Lemke likewise asserted that the claims were barred by the statute of limitation and also moved for a directed verdict on the fraud claim. The trial court granted Ellis's motion for directed verdict on the negligent hiring claim but denied all other motions. The jury returned a verdict for plaintiff, finding that Jensen and Lemke had obtained money from plaintiff by misrepresentation and fraud, that Jensen's conduct constituted professional negligence and breach of fiduciary duty, and that Ellis was vicariously liable for Jensen's conduct. The jury awarded plaintiff damages of $303,945 jointly and severally against all defendants.

We first address defendants' contention that the claims are barred by the applicable statute of limitation. It is undisputed that each claim is subject to a two-year statute of limitation and that plaintiff had to file her complaint within two years after discovery of the claims of fraud, negligence, and breach of fiduciary duty. *See* ORS 12.110(1); *Oregon Life and Health v. Inter-Regional Financial*, 156 Or App 485, 491, 967 P2d 880 (1998). The complaint was filed on October 11, 1999. Thus, the question is whether plaintiff discovered the alleged wrongful conduct before October 11, 1997. If she did, her claims are barred.

With respect to the negligence and breach of fiduciary duty claims,

"[t]he statute of limitation begins to run when the plaintiff knows or in the exercise of reasonable care should have known facts which would make a reasonable person aware

of a substantial possibility that each of the three elements [of a claim] (harm, causation, and tortious conduct) exists."

*Gaston v. Parsons*, 318 Or 247, 256, 864 P2d 1319 (1994). The standard does not require actual knowledge that each element of a claim is present; rather, the record must demonstrate that the plaintiff either actually discovered or, in the exercise of reasonable care, should have discovered that the defendant had violated the plaintiff's legally protected interest. As to the fraud claim, the analysis is similar, except that the actual or imputed knowledge that a plaintiff must have in order to start the running of the statute has been described as "including the fact of the fraud itself," *see Widing v. Schwabe, Williamson & Wyatt*, 154 Or App 276, 283, 961 P2d 889 (1998) (citing *Mathies v. Hoeck*, 284 Or 539, 542-43, 588 P2d 1 (1978)), that is, the misrepresentation and its falsity. *See also Greene v. Legacy Emanuel Hospital*, 335 Or 115, 127, 60 P3d 535 (2002).[1]

In the context of plaintiff's claims of professional negligence and breach of fiduciary duty, the issue is whether there are questions of fact as to when plaintiff learned that Jensen had been disloyal to her and that she had been harmed as a result of that disloyalty. In the context of the fraud claim against Jensen and Lemke, the question is when plaintiff became aware of the misrepresentations that caused her alleged harm.

■ We are convinced that, although plaintiff may have learned in late 1996 that misrepresentations had been made about Lemke's financial condition, there were factual issues as to when plaintiff discovered that she had been damaged. The McLeans became concerned when no work had been done on the property by the end of 1996, but Jensen continued to reassure them until November 1997 that all was well. Additionally, plaintiff's loan to Patricia Lemke did not become due until December 1997. The jury could reasonably find that, until that time, plaintiff believed that the loan would be paid when it became due or that she could recover

---

[1] In *Greene*, 335 Or at 123, the court took pains to explain why the phrase "inquiry notice," as used in its prior case law, does not accurately describe the imputed knowledge necessary to trigger the accrual of a claim under a statute of limitation that includes a discovery rule.

her money through foreclosure. Thus, there is evidence from which a jury could find that plaintiff did not learn that she had been damaged until she learned that her security interest was inadequate to cover the amount due on the loan. Plaintiff filed her complaint within two years of that date.

■■ Several of defendants' assignments of error address the trial court's failure to grant directed-verdict motions based on the insufficiency of the evidence. We will reverse the trial court's denial of the motions only if we can say that there was no evidence from which the jury could have found the facts necessary to support the verdict. *Brown*, 297 Or at 705. Having reviewed the record, we conclude that there was evidence to support each of the claims as well as each of the specifications of wrongful conduct. Specifically, we reject defendants' assertions that the evidence was insufficient to allow the jury to find, by clear and convincing evidence, that Jensen misrepresented the value of the River Road property to the McLeans and that he misrepresented Lemke's financial ability to complete the project. There also was evidence from which the jury could find that Jensen had a fiduciary relationship with the McLeans in which he assisted them in negotiating the loan and that Jensen provided professional services to plaintiff.

At trial, plaintiff's evidence of damages consisted of the testimony of her expert witness, Norman Pendell, a certified public accountant. Pendell provided calculations of damages based on two different assumptions. The first calculation, which Pendell described as a "benefit of the bargain" analysis, was based on the terms of the note. Starting with the face amount of the note, $150,000, Pendell added all expenditures incurred by the McLeans to recover their investment, plus interest of 20 percent, less proceeds on the sale of the River Road property, for net damages of $303,945. Pendell also calculated plaintiff's damages on a "cash only" basis, which began with the amount of the loan, $100,000, plus 9 percent interest from the date of the loan, less amounts recovered, for damages of $109,080.

The trial court gave a single instruction on damages:

"In determining the amount of any such damage, you must determine each of the items of the plaintiff's damages

that I'm now about to mention, provided you find the damages to have been incurred by her as a result of [defendants'] fraud, negligence, or breach of fiduciary duty. The plaintiff must prove each item of damages by a preponderance of the evidence. * * * If you find that plaintiff prevailed on her claim of fraud, then you must consider whether plaintiff has been damaged and, if so in what amount. First, if the defendants are guilty of fraud, they are liable to plaintiff for such damages as naturally and proximately result from the fraud. *Further, plaintiff is entitled to recover the monies which were represented to be the amount plaintiff would receive but which were not in fact received by plaintiff.* Plaintiff was further entitled to her out-of-pocket losses."

(Emphasis added.)

Defendants assign error to the trial court's admission of evidence on benefit-of-the-bargain damages, to the court's instruction on damages, and to the trial court's failure to give their requested instruction on damages. In defendants' view, the evidence and instructions erroneously permitted the jury to award plaintiff damages based on the benefit of her bargain. They assert that, because plaintiff's claims sounded in tort and she was not seeking punitive damages, she was entitled only to damages necessary to compensate her for her loss and not to damages that would provide her with the benefit of her bargain. Initially, we reject plaintiff's contention that the defendants' arguments were not preserved below as to each claim. Having reviewed the record, we conclude that defendants' contentions were preserved and that they related to each of the three claims. We review the trial court's rulings concerning the admission of the benefit-of-the-bargain evidence and the related jury instruction for errors of law. *State v. Rogers*, 330 Or 282, 310, 4 P3d 1261 (2000); *State v. Taylor*, 182 Or App 243, 48 P3d 182 (2002).

The general rule of damages in fraud is that a plaintiff is entitled to "such damages as naturally and proximately resulted from the fraud." *Selman v. Shirley*, 161 Or 582, 609, 85 P2d 384, 91 P2d 312 (1939). The same general rule applies in the context of negligence. *See McCulloch v. Price Waterhouse LLP*, 157 Or App 237, 242, 971 P2d 414 (1998). The focus of the parties' debate concerns the applicability of

two possible methods for calculating damages on each of the claims. Defendants assert that the proper measure of damages is an out-of-pocket measure, which is based on the difference between the purchase price of the property and the fair market value of the property on the date of sale. Plaintiff contends that she should be compensated for her expected gain from her investment by use of a benefit-of-the-bargain measure, based on the difference between the actual value of the property and its value as represented. *See Galego v. Knudsen*, 281 Or 43, 51, 573 P2d 313, *modified on other grounds*, 282 Or 155, 578 P2d 769 (1978). The latter method has been held to apply in the context of actionable fraud involving a warranty of value by the seller of property. *Galego*, 281 Or at 43; *see also Staley v. Taylor*, 165 Or App 256, 264, 994 P2d 1220 (2000). Because the transaction in this case was a loan rather than a purchase or exchange of property and did not involve a warranty of value by the seller, we agree with defendants that the benefit-of-the-bargain method is not applicable. Nor would that measure be particularly apt where, as here, no property changed hands between plaintiff and defendants and a value comparison is not available. *See Sorensen et ux v. Gardner et ux*, 215 Or 255, 265, 334 P2d 471 (1959). We decline to apply the analogy suggested by plaintiff to treat the note as the property purchased and to compare its actual value with the value represented by defendants.[2] And we are not aware of any circumstance in which the benefit-of-the-bargain measure of damages might be applicable to claims of professional negligence or breach of fiduciary duty.

When no property is exchanged, a similar concern is applicable with respect to the out-of-pocket method, which compensates the plaintiff for the difference between the amount paid for property and its fair market value. However, there is an analogous "out-of-pocket" rule of damages in cases

---

[2] Plaintiff argues:

"Here there's evidence from which the jury could find that the value of the $150,000 note was falsely represented. One could say that's what our whole case is about, is when they presented this $150,000 note to Linda McLean that they were telling her it was worth $150,000. That wasn't true, because the borrower had no ability to pay it and the security did not have adequate value where the $150,000 could be realized if it became necessary for her to execute on her collateral in the event that there was a default."

involving fraud in the inducement to make a loan based on misrepresentations concerning the value of the security or the financial position of the debtor. The Supreme Court has held that the proper measure of damages in such a case is the difference between the amount of the loan, that is, the amount "paid," and the value of the security given for the loan on the date of the loan. *White v. Gordon et al*, 130 Or 139, 143, 279 P 289 (1929); *compare Commercial Nat'l Bank of Peoria v. FDIC*, 131 Ill App 3d 977, 476 NE2d 809 (1985); *Black v. First Federal Sav. and Loan*, 830 P2d 1103 (Colo Ct App 1992) (damages is total amount loaned, plus interest).

This is such a case. In her second amended complaint, plaintiff alleged that defendants misrepresented (1) the amount of money that Lemke was investing in the River Road project; (2) the value of the River Road property; (3) the funds available to complete the project; (4) the use that would be made of plaintiff's money; and (5) the use that would be made of the AIC loan. The allegations each bear on defendants' misrepresentations concerning the value of plaintiff's security interest in the River Road property and Lemke's financial position. We conclude that the proper measure of damages is indeed an "out-of-pocket" measure, based on the difference between the amount of the loan and the value of plaintiff's actual security interest in the River Road property on the date of the loan. Thus, the trial court erred in permitting plaintiff to put on evidence concerning the benefit of the bargain. In light of the fact that no other evidence supported an award in the amount of the verdict, we conclude that the error was not harmless.

We are mindful, however, that in cases that do not involve the sale of property, flexibility is the key in formulating a measure of damages sufficient to compensate the plaintiff for losses proximately caused by the tortious conduct. *Dizick v. Umpqua Community College*, 287 Or 303, 312, 599 P2d 444 (1979). We accordingly reject defendants' contention that, as a matter of law, plaintiff cannot be compensated for the additional costs associated with the recovery of her investment. If there is evidence from which the jury could find that defendants' misrepresentations resulted in consequential damages not encompassed in the out-of-pocket measure, then those are also recoverable. *See Osborne v.*

*Hay*, 284 Or 133, 585 P2d 674 (1978); *Criqui v. Pearl Music Company*, 41 Or App 511, 599 P2d 1177, *rev den*, 288 Or 173 (1979). For the reasons discussed, we also conclude that the trial court's instruction was erroneous in permitting plaintiff to recover "monies which were represented to be the amount plaintiff would receive but which were not in fact received by plaintiff." In light of our decision on damages, we need not address the denial of defendant's post-trial motion for a new trial on damages.

We reject without discussion defendant's assignments of error concerning juror misconduct and the denial of their JNOV motion on damages.

Reversed and remanded for new trial on damages only.