Argued and submitted November 5, 2019, vacated and remanded for the trial court to determine whether to conduct *in camera* review June 3, 2021

MAT, INC.,
an Oregon corporation,
*Plaintiff-Respondent,*

*v.*

AMERICAN TOWER ASSET SUB, LLC,
a Delaware limited liability company; and
Spectrasite Communications, LLC,
a Delaware limited liability company,
*Defendants-Appellants.*

Marion County Circuit Court
13C16383; A163930

493 P3d 14

Plaintiff MAT, Inc. owns the farmland on which defendants own and maintain a television tower. MAT and defendants have a lease agreement that provides that MAT gets half of all revenue generated by any subtenants that use the tower. Upon discovering that defendants had not disclosed all rent-paying subtenants or given MAT its share of the revenue, MAT sued defendants for breach of contract. MAT sued outside of the statute of limitations but argued that the statute tolled because defendants fraudulently concealed the breach. Before trial, defendants requested *in camera* review of documents relating to revenue from certain subtenants. The trial court denied that request, relying on MAT's representation that an *in camera* review would not reveal any material, unprivileged information. The case went to a jury trial, and the jury returned a verdict in favor of MAT. Defendants appeal, assigning error to, among other things, (1) the trial court's denial of defendants' motion for directed verdict on the issue of fraudulent concealment, (2) the court's jury instructions on fraudulent concealment, and (3) the court's refusal to conduct an *in camera* review. *Held*: The trial court erred in refusing to conduct an *in camera* review. After defendants made the threshold showing that review might reveal material, unprivileged information, the court was required to apply the proper factors in determining whether to conduct review. The court did not err in denying defendants' motion for directed verdict, because the evidence adduced at trial was sufficient for the jury to find fraudulent concealment, and the court's jury instructions on fraudulent concealment were correct statements of the law.

Vacated and remanded for the trial court to determine whether to conduct *in camera* review.

Courtland Geyer, Judge.

David B. Hennes, New York, argued the cause for appellants. On the briefs were Shannon R. Martinez, Jennifer C. Paul, Daniel S. Reynolds, and Saalfeld Griggs PC.

Brian R. Talcott argued the cause for respondent. Also on the brief was Dunn Carney Allen Higgins & Tongue LLP.

Before Lagesen, Presiding Judge, and Egan, Chief Judge, and Powers, Judge.

LAGESEN, P. J.

Vacated and remanded for the trial court to determine whether to conduct *in camera* review.

**LAGESEN, P. J.**

Plaintiff MAT, Inc., owns the farmland on which defendants American Tower Asset Sub, LLC, and SpectraSite Communications, LLC,[1] own and maintain a 900-foot tall television tower. MAT and defendants have a lease agreement that provides that MAT gets half of all revenue generated by any subtenants that use the tower. Upon discovering that defendants had not disclosed all rent-paying subtenants or given MAT its share of the revenue, MAT sued defendants for, among other things, breach of contract. Because the limitations period for contract actions is six years, and because MAT sued more than six years after the date of the breach, MAT argued that defendants fraudulently concealed the breach, thereby tolling the statute of limitations. The case went to jury trial, including on the fraudulent concealment issue, and the jury found that defendants had fraudulently concealed their breach and, ultimately, returned a verdict in favor of MAT.

On appeal, defendants raise 10 assignments of error. We write primarily to address the first, second, third, and ninth. Defendants' first two assignments of error challenge the trial court's denial of their motion for a directed verdict on the issue of fraudulent concealment. Defendants' third assignment of error challenges the court's jury instructions on fraudulent concealment. And defendants' ninth assignment of error challenges, as a matter of law, the court's refusal to conduct an *in camera* review of communications that defendants believe might contain evidence that MAT, early on, knew or should have known that it had a cause of action against defendants. As explained below, we reject defendants' first through third assignments of error. We nonetheless vacate and remand because the trial court did not apply the proper legal standard when it denied defendants' request for *in camera* review and must do so now. We reject defendants' other assignments

---

[1] Ownership of the tower changed from SpectraSite to American Tower in a merger during the relevant time frame, but the jury found in favor of MAT against both defendants, so the change in ownership is largely irrelevant for purposes of the issues presented on appeal. We therefore refer to SpectraSite and American Tower collectively as "defendants" for ease of reading.

of error without written discussion, except as briefly noted below.[2]

## I.   FACTS

Although, as noted, defendants raise multiple assignments of error, and those different assignments of error implicate different standards of review, the primary challenges that we address are to the trial court's denial of defendants' motion for a directed verdict on the statute of limitations issue. For that reason, in accordance with the applicable standard of review, we state the facts about the parties' underlying dispute in the light most favorable to MAT, the nonmoving party. *See Kelley v. Washington County*, 303 Or App 20, 21-22, 463 P3d 36 (2020).

The lease agreement for the land on which the television tower is situated was executed in 1981, around the time the tower was constructed. The landlord and tenant at the time (not parties to this appeal) contemplated that subtenants would lease space on the tower, and they agreed to equally share revenue generated from subtenant rent:

> "Tenant may not assign or sublet this lease without the written approval of Landlord, which approval shall not be unreasonably withheld. In the event Tenant sublets the tower or otherwise allows other broadcasters to use the improvements on the premises, Landlord and Tenant shall share equally the gross revenue from said use."

Around November 2001, defendants purchased the television tower from the tenant under the lease at the time, Paxson Communications of Portland-22, Inc. (Paxson). By then, ownership of the farmland (and, relatedly, the landlord's interest in the lease) had transferred from father to son, who formed MAT, Inc., to manage the lease. In conjunction with defendants' purchase of the tower, MAT signed a

---

[2] In the fifth assignment of error, defendants contend that the trial court erred when it concluded that there was sufficient evidence to reject defendants' defenses to MAT's related equitable claim for an accounting. In the sixth assignment of error, defendants contend that the trial court erred when it concluded that there was sufficient evidence to reject defendant's contention that the accounting claim was barred by a claims release that MAT had signed. We reject these assignments of error for largely the same reasons that we reject the first three assignments of error.

Landlord Consent and Estoppel Certificate, consenting to the change in interest from Paxson to defendants and also consenting to Paxson's "continued use of certain portions of the tower and improvements on the Property." Defendants then assumed the lease agreement, becoming the tenant under it. Shortly thereafter, defendants and Paxson entered into a sublease agreement, which provided that defendants would lease space on the tower to Paxson in exchange for $6,000 monthly rent (to increase over time) beginning on January 1, 2002. MAT was unaware of this agreement and did not receive a share of the rent, which Paxson paid and defendants collected until 2009.

In May 2007, defendants requested MAT's consent to sublet space on the tower to a new subtenant, Churchill Communication, LLC (Churchill). MAT, through its attorney at that time, granted its consent but requested an accounting of all of the subleases on the tower. The request explained that "we still need a copy of the proposed lease and an accounting of all the leases at the site so that we can know what lease payments [MAT] should be receiving based upon the 50% revenue share provision in the lease and the addition of this new lease." On June 12, 2007, defendants refused the request, responding:

"American Tower does not release tenant license agreements as they are proprietary documents which is why we provide in writing the tenant rental amounts.

"I am having our finance team look at the tower history and it appears that American Tower may owe additional revenue for a tenant that may have been placed on the tower by SpectraSite, but I am waiting for confirmation of the amounts and then I will forward a Release and Settlement Agreement that we would need to execute prior to payment. I should have all the information finalized and the document ready for your review by the end of the week."

As a result of that review, defendants found that they owed MAT $17,101.53 in revenue from a different subtenant, Northwest TV. MAT again requested that defendants disclose their subtenant agreements, this time offering to sign a confidentiality and nonuse agreement. MAT's attorney explained:

"I understand that you have asserted that the licensee agreements are proprietary. However, as the landowner entitled to contractual payments of 50% of 'gross revenues', we cannot make an informed decision on how much your company owes my client without looking at the applicable agreements. If you need a confidentiality and nonuse agreement, we will sign one."

Defendants again declined MAT's request. Ultimately, at defendants' request, MAT signed a release agreement (the 2007 Release) to receive payment of its share of defendants' revenue from Northwest TV. The release stated that it discharged defendants "from any and all claims, damages, causes of actions or suits of any kind or nature, relating to or arising from the gross revenue shares due to [MAT] from [defendants] from May 2005 to July 2007 and any consent which may have been required under the Lease." Churchill then took over Northwest TV's lease, and MAT received its share of Churchill's revenue from that point on.

In April 2008, MAT received a revenue share invoice listing Paxson as a tenant that had paid defendants $8,971.60 for "Tower Rent" for the month of March and indicating that none of that money would be paid to MAT. MAT did not notice at the time that the invoice identified Paxson as a revenue-paying tenant.

In November 2009, the Churchill revenue-share payments to MAT stopped, and MAT again requested that defendants provide it with detailed information on the tower's subtenants and rental revenue. Defendants responded that MAT had not been paid because Churchill had failed to make its payments. They also represented that Churchill was the only tenant on the tower at that time,[3] and that, in defendants' view, defendants were current on their revenue payments to MAT from May 2008 forward.

In August 2010, MAT again requested information on subtenants and the revenue generated by them. In defendants' letter response, besides listing Churchill as the only

---

[3] Defendants may have believed that Churchill was the only tenant at that time, though a different tenant, Slater Communications, may have been operating on the tower without a contract at the time.

active contract on the tower, they stated that Paxson "has also operated on the tower, but ceased transmission in June 2009." Defendants' letter did not indicate that Paxson had paid rent to them from January 2001 to June 2009. Around this time, MAT turned down multiple requests from defendants to buy out its lease.

In December 2012, MAT finally became aware that Paxson and other subtenants had been paying defendants rent. MAT asked defendants about that and defendants took the position that Paxson's status as a former tenant meant that any revenue generated by Paxson's use of the tower did not have to be shared with MAT.

Unable to resolve the dispute without litigation, MAT filed this case on May 30, 2013, alleging claims for breach of contract and equitable accounting. The statute of limitations and, in particular, the point in time at which MAT knew or reasonably should have known that defendants were not sharing the Paxson revenues promptly became an issue.

Before trial, defendants requested that the court review *in camera* communications between MAT and its former attorney. Defendants believed that there could be evidence in the communications showing that MAT knew about Paxson, which would defeat MAT's claim that, based on tolling the statute of limitations, it had timely initiated its action. After MAT produced a privilege log of the communications, defendants requested "that the Court review in-camera everything identified in the privilege log to the extent there is a reference to Paxson or revenue-sharing or both items." MAT, through counsel, responded that it had reviewed the documents and determined that "there are no documents which bear on this issue." Although the court concluded that there had been "an implied, limited waiver of the attorney-client privilege because [MAT] put at issue in this proceeding whether [MAT] knew or should have known that Defendants were receiving rent or revenue from Paxson," it denied *in camera* review of the privilege log based on MAT's representations that none of the documents were relevant. The court explained:

"I can think of only one case where the representation of no responsive documents exist was not enough * * *. So counsel has made that representation in letter, has repeated it here in court on the record, and given that we are looking at what appears to be either work product or attorney/client communications, I don't see enough to require production beyond what has been done in creating the privilege log."

The case proceeded to a jury trial and, at the close of MAT's case, defendants moved for directed verdict. They argued that MAT's claims arising out of Paxson's rent were barred in part by the six-year statute of limitations on breach of contract claims, and that MAT had failed to present sufficient evidence of fraudulent concealment so as to toll the statute of limitations. Defendants also argued that MAT's claims were barred in part by the 2007 Release that MAT had signed. The court denied the motion.

The jury returned a verdict in favor of MAT. It specifically concluded that (1) defendants breached an obligation to share revenue from Paxson, (2) before May 30, 2007, defendants had the intent to deceive MAT and affirmatively acted to do so, (3) MAT and defendants were in a special relationship that required defendants to disclose that they were receiving revenue from Paxson, and (4) MAT did not, by signing the 2007 Release, release its claims to receive revenue shares from Paxson from May 2005 through July 2007. The jury found further that MAT was entitled to $347,155.84 in damages, and the court, in its general judgment, awarded that amount, as well as $311,164.16 in prejudgment interest and $5,197.50 for MAT's accounting claim.

Defendants appealed. They challenge, among other things, (1) the trial court's denial of their motion for a directed verdict on statute-of-limitations grounds; (2) the court's denial of their motion for a direct verdict based on the 2007 Release; (3) the court's jury instruction on fraudulent concealment; and (4) the court's denial of their request for *in camera* review.

## II. ANALYSIS

### A. *Statute of Limitations*

We start with defendants' contention that the trial court erred by denying their motion for directed verdict on

statute-of-limitations grounds. At issue in particular is the sufficiency of the evidence supporting the jury's determination that defendants fraudulently concealed from MAT their failure to share subtenant rent. If the evidence is sufficient to support the jury's determination that defendants concealed their breach of the lease agreement such that MAT should not have reasonably known of the breach until at least May 30, 2007—six years prior to MAT suing defendants—then the statute of limitations tolled and MAT's claim for breach of contract was timely.

We review for legal error the denial of a motion for directed verdict, considering the evidence in the light most favorable to the nonmoving party. *Chang v. Chun*, 305 Or App 144, 158, 470 P3d 410 (2020). On review of a denial of a motion for directed verdict based on the statute of limitations, "We will not set aside a verdict unless we can say affirmatively that there is no evidence from which the jury could have found the facts necessary to support the verdict." *McLean v. Charles Ellis Realty, Inc.*, 189 Or App 417, 419, 76 P3d 661 (2003), *rev den*, 337 Or 34 (2004).

The statute of limitations on a claim for breach of contract is six years, and it begins to run at the time of contract breach. *See* ORS 12.080; *Waxman v. Waxman & Associates, Inc.*, 224 Or App 499, 512, 198 P3d 445 (2008) ("[I]t is well settled that a contract claim accrues on breach."). The limitations period is tolled, however, if the breaching party fraudulently conceals the breach from the nonbreaching party:

> "'[F]raudulent concealment of a cause of action from the one in whom it resides by the one against whom it lies constitutes an implied exception to the statute of limitations, postponing the commencement of the running of the statute until discovery or reasonable opportunity of discovery of the fact by the owner of the cause of action. Under this rule, one who wrongfully conceals material facts and thereby prevents discovery of his wrong or of the fact that a cause of action has accrued against him is not permitted to assert the statute of limitations as a bar to an action against him, thus taking advantage of his own wrong, until the expiration of the full statutory period from the time when the

facts were discovered or should, with reasonable diligence, have been discovered.'"

*Chaney v. Fields Chevrolet*, 264 Or 21, 26-27, 503 P2d 1239 (1972) (adopting and quoting L. S. Tellier, Comment Note, *What Constitutes Concealment Which Will Prevent Running of Statute of Limitations*, 173 ALR 576, 578 (1948)). Said another way, a party claiming tolling based on fraudulent concealment must show that (1) the breaching party fraudulently concealed the fact of their breach and (2) notwithstanding reasonable diligence on the part of the nonbreaching party, the breaching party's wrongful conduct prevented the discovery of the breach. *Id.*; *see also Forest Grove Brick v. Strickland*, 277 Or 81, 559 P2d 502 (1977). As we understand the case law, fraudulent concealment for tolling purposes is essentially the same as common-law fraud. *See Chaney*, 264 Or at 26-27; *Fehl v. Horst*, 256 Or 518, 524, 474 P2d 525 (1970). When tolling applies, the statute of limitations runs from the date that the nonbreaching party discovered the breach or, with the exercise of reasonable diligence, should have discovered the breach. *Chaney*, 264 Or at 27.

On appeal, defendants argue both that (1) under a correct understanding of what constitutes fraudulent concealment, the evidence is insufficient to support a finding that they fraudulently concealed their breach and (2) even if the evidence would support a finding of fraudulent concealment, the evidence is insufficient to support a finding that MAT did not know, and should not, with the exercise of reasonable diligence, have known, of the breach before May 30, 2007. We consider those arguments in turn.

1.  *Fraudulent concealment*

Defendants argue that, because they were not in a special or fiduciary relationship with MAT, they had no duty to disclose to MAT the fact of the breach. That means, to prove fraudulent concealment, MAT had to prove that defendants actively concealed the breach with the intent to defraud MAT and, in defendants' view, MAT's evidence is legally insufficient to do that. In response, MAT argues both that (1) the parties were in the type of special relationship that gave rise to an obligation to disclose the breach and (2) regardless, the evidence supports a finding that MAT

engaged in the type of conduct constituting active conceal-
ment with an intent to deceive. We agree with MAT that
the record supports a finding of active concealment with an
intent to deceive, so we do not address whether the parties'
relationship gave rise to a duty to disclose. *See Caldwell v.
Pop's Homes, Inc.*, 54 Or App 104, 113, 634 P2d 471 (1981)
("Where fraud is based on actual concealment, as opposed to
simple nondisclosure, a duty to speak is not required."); *see
also Paul v. Kelley*, 42 Or App 61, 65, 599 P2d 1236 (1979)
(noting that the *Restatement (Second) of Torts* sections 550,
551 (1977) provide that "nondisclosure is actionable where
there is a duty to speak, but notes no such duty requirement
where there has been an active concealment").

Active or actual concealment means:

> "*Any words or acts which create a false impression cover-
> ing up the truth, or which remove an opportunity that might
> otherwise have led to the discovery of a material fact* as by
> floating a ship to conceal the defects in her bottom, sending
> one who is in search of information in a direction where it
> cannot be obtained, *or even a false denial of knowledge by
> one in possession of the facts are classed as misrepresenta-
> tions*, no less than a verbal assurance that the fact is not
> true."

*Caldwell*, 54 Or App at 113 (referring to William L. Prosser,
*Law of Torts* § 106, at 695 (4th ed 1971) (internal omissions
and quotation marks omitted; emphases added)). Active con-
cealment with an intent to deceive may be inferred from
half-truths: "'Fraud may be predicated upon an equivocal,
evasive or misleading answer calculated to convey a false
impression even though it may be literally true as far as it
goes.'" *Package Containers v. Director's*, 270 Or 845, 852, 530
P2d 40 (1974) (quoting *Sheets v. B & B Personnel Systems*,
257 Or 135, 145, 475 P2d 968 (1970)); *see also Krause v.
Eugene Dodge, Inc.*, 265 Or 486, 505, 509 P2d 1199 (1973)
("[B]ecause a half truth is sometimes the worst kind of a
lie, one who makes a representation to the purchaser of a
product in the nature of a half-truth thereupon assumes the
affirmative obligation to make a full and fair disclosure of
the whole truth, even though he would have had no such
obligation had he not undertaken to state such a half-truth."
(Internal quotation marks and citations omitted.)).

Given its factual similarity to the present case, the decision in *Package Containers* illustrates how conduct like defendants' is sufficient to allow a jury to conclude that defendants fraudulently concealed their breach. There, the plaintiff entered into an agreement with the defendants to lease a portion of the defendants' property. 270 Or at 847. The agreement required the plaintiff to pay the defendants "for all water consumed" by the plaintiff. *Id.* Two other tenants were later added to other portions of the same property, also with lease agreements requiring them to pay for the water that they consumed. But because the plaintiff's water charges were based on a meter reading from the main water line (rather than the submeter readings used to calculate the water use of the other two tenants), without informing the plaintiff, the defendants charged the plaintiff for all three tenants' water use, while simultaneously collecting the individual amounts owed from the other tenants without crediting the plaintiff's account for those amounts. *Id.* at 847-48.

The same year that the third tenant was added to the property, the plaintiff requested a credit on its water charges. *Id.* The defendants denied the request but allowed a temporary "discount," explaining, "'[W]e feel that perhaps you have had an excessive loss [due] to the leakage in the street.'" *Id*. at 848. Although the defendants granted the plaintiff a temporary discount based on the ostensible leakage, they still did not disclose that they were charging the plaintiff for the water used by all the tenants, while also charging the other tenants for the amounts that they used. *Id*. at 847-49. Over seven years after the plaintiff's request for a water charge credit, it received a particularly excessive water bill, conducted an investigation, discovered the submeters, and discovered that the defendants had been overcharging it for water for over a decade. *Id.* at 848-49.

The plaintiff brought an action against the defendants for fraudulent conduct, and the jury found in favor of the plaintiff. On appeal to the Supreme Court,[4] the defendants

---

[4] When *Package Containers* was published in 1974, appeals of civil cases such as this one went directly to the Supreme Court. At the time, this court had appellate jurisdiction over primarily criminal, domestic relations, and state agency cases. *See* ORS 2.510(2) (1973). The legislature expanded the Court of Appeals' jurisdiction in 1977. *See* Or Laws 1977, ch 158, § 2; ORS 2.516 (1977).

challenged the sufficiency of the evidence of fraud. *Id.* at 849-50. The plaintiff responded

> "that defendants had a duty to disclose the true facts to plaintiff, particularly after plaintiff's letter of November 18, 1965; that defendants, in their letter of March 30, 1966, concealed the true facts as to [the other tenants'] use of water and blamed it on a leakage; that there is substantial evidence to support the jury verdict which found fraudulent conduct on the part of defendants."

*Id.* at 849. The court agreed with the plaintiff. As quoted above, it explained that "[f]raud may be predicated upon an equivocal, evasive or misleading answer calculated to convey a false impression even though it may be literally true as far as it goes." *Id.* at 852 (internal quotation marks omitted). It concluded that, on the facts presented, the jury could have found that the defendants had an obligation to disclose that they were overcharging the plaintiff and had fraudulently concealed that information:

> "The jury could have found from the evidence that defendants, notwithstanding their obligation and opportunity to disclose, never informed plaintiff of the circumstances and accepted water payments from all of the tenants and concealed this information from the plaintiff * * *."

*Id.* at 853.

        This case is not materially distinguishable from *Package Containers*. Viewing the record in the light most favorable to MAT, defendants began collecting subtenant rent from Paxson around January 2002 and did not disclose that fact until April 2008, when it sent an invoice listing Paxson as a rent-paying subtenant. Within that span of years, MAT repeatedly requested that defendants provide it a list of subtenants and the rent that those subtenants were paying so that it could determine whether it was getting paid the correct amount in revenue shares. Not only were those requests repeatedly denied, they were met with responses that did not disclose the full truth about what rents defendants were collecting, a demand to sign a release of *all* claims in order to get paid a partial amount of the rent owed, and, later, buyout offers. As was the case in *Package Containers*, all of this, when viewed in the light most favorable to MAT's

claim of fraudulent concealment, would allow a factfinder to find that defendants intentionally concealed from MAT the amounts owed from the Paxson rent.

    2.  *Knew or should have known cause of action*

        Defendants also argue that the evidence is not sufficient to support a finding that MAT did not know, or could not, in the exercise of reasonable diligence, have known of the breach. We disagree.

        First, to the extent defendants argue that the evidence is insufficient to support a finding that MAT did not, in fact, know of the breach, we reject that argument without discussion.

        Second, on the evidence presented, a reasonable jury could have determined that MAT could not, in the exercise of reasonable diligence, have discovered the breach. As the Supreme Court has explained, this standard is not a rigid one:

> "The concept of due diligence is not imprisoned within the frame of a rigid standard; it is protean in application. A fraud which is flagrant and widely publicized may require the defrauded party to make immediate inquiry. On the other hand, one artfully concealed or convincingly practiced upon its victim may justify much greater inactivity. The presence of a fiduciary relationship or evidence of fraudulent concealment bears heavily on the issue of due diligence."

*Forest Grove Brick*, 277 Or at 86 (internal quotation marks omitted). Because of this, the standard is one that usually presents a jury question, rather than a question to be resolved as a matter of law, provided there is evidence presented that would allow a jury to find in the plaintiff's favor on the point. *See id.* at 87 ("'It usually is not feasible to resolve on motion for summary judgment cases involving questions such as when knowledge is discoverable by reasonable diligence of plaintiff and concealment by the defendants.'" (Quoting *Hoeflich v. William S. Merrell Co.*, 288 F Supp 659, 662 (ED Pa 1968).)); *see also McCraw v. Stapp*, 82 Or App 79, 84-86, 727 P2d 160 (1986) (in view of the defendant's alleged false representations, it was a fact issue for

the jury when plaintiffs could have, in the exercise of reasonable diligence, discovered their claims).

Here, defendants contend that MAT should have known about their breach of the lease agreement through MAT's "negotiation of the Estoppel Certificate, or the 2007 Release, or the most basic due diligence." Regarding the estoppel certificate, defendants point to the portion of the agreement allowing the "continued use of certain portions of the tower and improvements on the Property by [Paxson] or an affiliate of [Paxson]" as evidence precluding the conclusion that MAT could not have known, in the exercise of reasonable diligence, that Paxson would be paying rent to defendants as a subtenant. We disagree that the evidence eliminates any jury question on the point, in view of the evidence of defendants' fraudulent concealment and the Supreme Court's recognition that "evidence of fraudulent concealment bears heavily on the issue of due diligence." *Forest Grove Brick*, 277 Or at 86. We reach the same conclusion with respect to the 2007 Release for the same reason.

B.   *2007 Release as Basis for Motion for Directed Verdict*

Our previous analysis of the evidence of defendants' fraudulent concealment largely disposes of defendants' second assignment of error, which, as mentioned, challenges the trial court's decision to leave to the jury the issue of whether the 2007 Release that MAT had signed precluded recovery for all unpaid subtenant rent generated from May 2005 to July 2007. The trial court concluded that it was a jury question whether the release barred MAT's claim for subtenant rent during that period, because of the evidence that would support a finding that defendants engaged in fraudulent conduct (actively concealing the rents owed from Paxson) that induced MAT to sign the release. As explained, the evidence would support a finding that defendants engaged in fraudulent concealment of the facts about the Paxson rent due (in particular, through only partially disclosing the amount of subtenant rent due without providing a full accounting of all tenants). That same evidence would also support a finding that that fraud induced MAT to sign the release. We reject defendants' second assignment of error.

C.   *Jury Instructions on Fraudulent Concealment*

Defendants third assign error to the trial court's jury instructions on fraudulent concealment. We review whether the trial court erred in instructing the jury for legal error. *State v. Morales*, 307 Or App 280, 287, 476 P3d 965 (2020).

Defendants contend that the following two instructions regarding half-truths and concealment improperly omit a legally required need for a special relationship between the parties:

> "A person who makes a representation in the nature of a half-truth, assumes the affirmative obligation to make a full and fair disclosure of the whole truth. The failure to make a full and fair disclosure of the whole truth may be a false representation.
>
> "\* \* \* \* \*
>
> "A person may make a false representation of a material matter by concealing the truth. A false representation by concealment occurs when a person, by any word or act, conceals a material matter either by creating a false impression covering up the truth, or by removing an opportunity that might otherwise have led to the discovery of the truth."

We conclude that both of those instructions are correct statements of the law, and neither improperly omitted a need for a special relationship.

Beginning with the second instruction quoted above, that instruction closely tracks with our articulation of active concealment in *Caldwell*, which defines fraudulent concealment as "[a]ny words or acts which create a false impression covering up the truth, \* \* \* or which remove an opportunity that might otherwise have led to the discovery of a material fact." 54 Or App at 113. That route to finding fraudulent concealment does not require first finding that there was a special relationship or duty to disclose between the parties. Accordingly, the trial court was correct not to include requirements for those findings in its instructions.

As for the instruction on half-truths, as previously explained, half-truths give rise to an affirmative

obligation to disclose the whole truth regardless of the parties' relationship:

> "[B]ecause a half truth is sometimes the worst kind of a lie, one who makes a representation to the purchaser of a product in the nature of a half-truth thereupon assumes the affirmative obligation to make a full and fair disclosure of the whole truth, even though he would have had no such obligation had he not undertaken to state such a half-truth."

*Krause*, 265 Or at 505 (internal quotation marks and citations omitted). Similarly, as the Supreme Court has concisely explained,

> "[a] partial and fragmentary disclosure accompanied by wil[l]ful concealment of material and qualifying facts is not a true statement and is often as much a fraud as an actual representation.
>
> "The foregoing principles are of general application, and to apply them it is not necessary to establish a confidential relationship."

*Heise et ux v. Pilot Rock Lbr. Co.*, 222 Or 78, 92, 352 P2d 1072 (1960) (internal quotation marks omitted). The court's instruction on half-truths correctly stated the law.

Defendants additionally argue that the fact that the jury found both a special relationship and active concealment (despite the jury verdict form's instruction that the jury should only make an affirmative finding on one of the two) shows that the jury was confused by the court's failure to include the special relationship requirement in its articulation of the challenged jury instructions. That argument is not well developed and, in all events, does not demonstrate that the instructions incorrectly stated the law by omitting a requirement of a special relationship.

D.   In Camera *Review*

Finally, we address defendants' ninth assignment of error. Defendants contend that the trial court erred as a matter of law in declining to conduct an *in camera* review. They argue that they made the required threshold showing that a review of the privilege log might yield unprivileged evidence and that the court erred in relying on MAT's

representation that none of the documents related to MAT's knowledge of undisclosed subtenants. We agree.

In determining whether to conduct an *in camera* review of material that might contain admissible information along with privileged information, the trial court must engage in a two-step process. First, the court must "determine whether the party seeking the review has 'produced evidence sufficient to support a reasonable belief that *in camera* review might yield' relevant unprivileged evidence." *State v. Bray*, 281 Or App 584, 616, 383 P3d 883 (2016), *aff'd*, 363 Or 226, 422 P3d 250 (2018) (quoting *Frease v. Glazer*, 330 Or 364, 373, 4 P3d 56 (2000)). We review that determination for legal error. *Id.* If the court determines that the party seeking review has produced such evidence, the court must then make the second determination of whether to conduct *in camera* review. In doing so, it must consider "the facts and circumstances of the particular case, the volume of materials at issue, the relative importance of information sought, and whether such information might be available from non-privileged sources." *State v. Lammi*, 281 Or App 96, 98-99, 380 P3d 1257, *rev den*, 360 Or 697 (2016) (citing *United States v. Zolin*, 491 US 554, 572, 109 S Ct 2619, 105 L Ed 2d 469 (1989), adopted in *Frease*, 330 Or at 372). We review that determination for abuse of discretion. *Id.* at 99 n 1.

We conclude that defendants made a threshold showing that *in camera* review might yield unprivileged evidence and that the trial court therefore legally erred. Defendants made that showing by demonstrating that many of the communications with MAT's former attorney concerned Paxson or revenue sharing or both. For example, defendants pointed out such a document involving "correspondence regarding the consent and estoppel agreement" on the privilege log, citing that document as "exactly one of the operative documents that is of concern to the Court with respect to what was known or should [have] been known at that time with respect to Paxson and revenue." Multiple other entries in the log were labeled as communications or work product concerning both Paxson and revenue sharing. In the context of the court's determination that MAT had waived attorney-client privilege with respect to communications suggesting

that MAT knew or should have known that Paxson was a rent-paying subtenant—a determination that MAT does not challenge on appeal—it is reasonable to think that a review of MAT's correspondence concerning Paxson and revenue sharing "*might* yield relevant unprivileged evidence." *Bray*, 281 Or App at 616 (internal quotation marks omitted; emphasis added).

As for the trial court's reliance on MAT's representations that it had reviewed the documents and found nothing of importance, MAT cites no case (and we are aware of none) that supports the proposition that such a representation from an opposing party is sufficient to defeat a *prima facie* showing that it is reasonable to believe that review might yield material unprivileged evidence. *Cf. Zolin*, 491 US at 572 (party must support claim that *in camera* review may reveal unprivileged evidence with "a showing of a factual basis adequate to support a good faith belief by a reasonable person," and that showing "need not be a stringent one" (internal quotation marks omitted)); *Lammi*, 281 Or App at 98-99 (burden on party seeking *in camera* review to make a threshold showing); *see also In Re Grand Jury Subpoena 92-1(SJ)*, 31 F3d 826, 829-30 (9th Cir 1994) ("[T]he first step of the analysis should focus only on evidence presented by the party seeking *in camera* review."). Indeed, to conclude so would undercut the purpose of *in camera* review—having a neutral third party noninvasively review privileged or sensitive information in such a way that facilitates fair litigation and trust in the adjudicative process.

We therefore conclude that the trial court erred in determining that defendants did not make the threshold showing for *in camera* review. Because the court did not reach the second question of whether to exercise its discretion to conduct *in camera* review, we vacate the judgment and remand for the court to apply the *Zolin* factors and make that determination.[5] If the court, upon weighing the

---

[5] We note that we do not understand the trial court to have found that defendants made the threshold showing for *in camera* review and then rejected defendants' request under the second *Zolin* prong. But, to the extent that the record allows for that possibility, the court did not apply the *Zolin* factors in making its decision. Thus, whether a first prong or second prong case, either way, remand is required for the court to correctly exercise its discretion.

relevant factors, declines to conduct an *in camera* review, or it conducts review and concludes that the documents do not contain material evidence, then defendants are not entitled to a new trial. If the court conducts review and discovers material evidence that MAT knew or should have known of Paxson's revenue, then defendants are entitled to a new trial.

Vacated and remanded for the trial court to determine whether to conduct *in camera* review.